**UTE INDIAN TRIBE, Plaintiff,**

v.

**STATE OF UTAH, Defendant-
in-Intervention,**

**and**

**Duchesne County, a political subdivision of the State of Utah; Uintah County, a political subdivision of the State of Utah; Roosevelt City, a municipal corporation; and Duchesne City, a municipal corporation, Defendants.**

No. 75–C–408J.

United States District Court,
D. Utah,
Central Division.

April 2, 1996.

Robert S. Thompson, III, Office of Legal Counsel, Ute Indian Tribe, Fort Duchesne, Utah, for Plaintiff, the Ute Indian Tribe.

John W. Andrews and Michael M. Quealy, Utah Attorney Generals Office, Salt Lake City, Utah, for Defendant-in-Intervention, the State of Utah.

Herbert Wm. Gillespie, Duchesne County Attorney, Roosevelt, Utah, for Defendant, Duchesne County.

Joann B. Stringham, Uintah County Attorney, Vernal, Utah, for Defendant, Uintah County.

Tom Tobin, Winner, SD, for Defendants, Duchesne and Uintah Counties.

Roland Uresk, Roosevelt, Utah, for Defendant Duchesne City.

Clark Allred, McKeachnie & Allred, Vernal, Utah, for Defendant Roosevelt City.

Lauren N. Soll, U.S. Department of Justice, Land and Resource Division, Washington, DC, for U.S. Department of Justice.

Joseph Anderson, Assistant U.S. Attorney, Midvale, Utah, United States of America as amicus curiae.

William McConkie, Office of Solicitor, U.S. Dept. of the Interior, Salt Lake City, Utah, for U.S. Department of the Interior.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

On September 12, 1994, the above-captioned matter came on before this Court for a hearing on the merits. Robert S. Thompson, III, Esq., appeared on behalf of the plaintiff, the Ute Indian Tribe. John W. Andrews, Esq., and Michael M. Quealy, Esq., appeared on behalf of the State of Utah. Herbert Wm. Gillespie, Esq., Duchesne County Attorney, and Joann B. Stringham, Esq., Uintah County Attorney, accompanied by Tom Tobin, Esq., appeared on behalf of defendants Duchesne and Uintah Counties. Roland Uresk, Esq., appeared on behalf of defendant Duchesne City. Clark Allred, Esq., appeared on behalf of defendant Roosevelt City. Lauren N. Soll, Esq., United States Department of Justice, and Joseph Anderson, Esq., Assistant United States Attorney, appeared on behalf of the United States of America as amicus curiae, accompanied by William McConkie, Esq., United States Department of the Interior.

The pending motions revisit a subject explored in depth in this same litigation some time ago: the territorial extent of the Ute Indian Tribe's jurisdiction, at least as it may be delimited by the legal boundaries of the Uintah and Ouray Indian Reservation. That question was resolved among these parties by *Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986), resulting in a judgment that the Ute Indian Tribe now seeks to enforce in this court through entry of a permanent injunction. The State of Utah, defendants Duchesne and Uintah Counties, Duchesne City and defendant Roosevelt City (collectively, the "State and Local Defendants"), resist this, urging this court instead to disregard the Tenth Circuit's *en banc* ruling on appeal in this litigation in favor of redetermining the Ute reservation boundaries in light of the United States Supreme Court's more recent decision in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). These defendants have also moved to dissolve the Order, entered by this court pursuant to stipulation of the parties on September 2, 1992, (nunc pro tunc to August 3, 1992), which was designed to preserve (more or less) the jurisdictional status quo pending the determination of the Ute Indian Tribe's Renewed Motion for Injunctive Relief.[1]

---

1. The September 2, 1992 Order was once modified "to allow the State and Local Defendants to prosecute felony crimes occurring on lands within the original boundaries of the Uintah Valley Reservation which are not 'Indian Country' as defined by 18 U.S.C. § 1151, *et seq.*" Order, dated May 2, 1994, at 1–2. "In making this modification," however, this court was "not determining one way or another which lands may or may not constitute 'Indian Country,'" and the Order was entered "without prejudice to any claims of the parties as to the effect of the decision of the United States Supreme Court in *Ha-*

## Background and Procedural History

As the Ute Indian Tribe explains in its brief, the promulgation in 1975 of the Ute Law and Order Code "raised immediate protests from the State of Utah and from the political subdivisions located within the original boundaries" of the Ute Reservation. Brief of Plaintiff Ute Indian Tribe in Opposition to Defendants' Motion to Dissolve Preliminary Injunction, filed July 15, 1994, at 2–3. "In the hope of establishing, once and for all, the exterior boundaries of the Reservation, and the geographic scope of the Tribe's jurisdiction, the Tribe filed [this] action for declaratory relief in this Court in 1975," joining Duchesne County, Duchesne City and Roosevelt City as defendants. *Id.* at 3. The State of Utah intervened as a defendant and Uintah County was joined as a defendant by stipulation of the parties in the Pretrial Order. After conducting a trial on the merits and examining the pertinent legislation and historical materials in some detail, this court made an initial ruling defining the boundaries of the Uintah Valley Reservation and holding that the Uncompahgre Reservation had been disestablished. *See Ute Indian Tribe v. State of Utah,* 521 F.Supp. 1072 (D.Utah 1981). That determination was affirmed in part and reversed in part by a three-judge panel of the Tenth Circuit (716 F.2d 1298 (10th Cir.1983)); the panel's decision in turn was affirmed in part and reversed in part on rehearing *en banc* (773 F.2d 1087 (10th Cir.1985)). The United States Supreme Court denied certiorari (479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986)), and the Tenth Circuit issued its mandate pursuant to the *en banc* ruling, which was docketed by the Clerk of this court on December 9, 1986. Notice of receipt of the mandate was mailed to all counsel of record.

In its *en banc* ruling, the Tenth Circuit held that the Uintah Valley Reservation, created by Executive Order in 1861 [2] and confirmed by Act of Congress in 1864,[3] had not been diminished by congressional legislation enacted from 1902 through 1905 opening unallotted and unreserved lands on the Reservation to entry under the homestead and townsite laws,[4] or by the inclusion of portions of the Reservation among lands withdrawn as national forest lands by Act of Congress and Presidential Proclamation in 1905.[5] 773 F.2d at 1088–1090; *see also id.* at 1099–1100 (Seymour, Holloway, McKay & Logan, JJ., concurring). The Tenth Circuit likewise held that the Uncompahgre Reservation had not been diminished by allotment legislation enacted in 1894 and 1897, which restored its unallotted lands "to the public domain" and opened them " 'for location and entry under all the land laws of the United States; ....' " 773 F.2d at 1090–93 (quoting the Act of June 7, 1897, ch. 3, 30 Stat. 62, 87); *see also id.* at 1093–1099 (Seymour, Holloway, McKay & Logan, JJ., concurring).

The Tenth Circuit's *en banc* ruling closely followed the Supreme Court's decision in *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), decided 18 months earlier. Writing for a unanimous Court in *Solem,* Justice Thurgood Marshall concluded that the 1908 Act,[6] which authorized and directed the Secretary of the Interior "to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations ... lying and being within the following described boundaries, ... " when "read as a whole, does not present an explicit expression of congressional intent to diminish the

gen v. Utah, or as to which lands may or may not constitute 'Indian Country.' " *Id.* at 2.

**2.** Executive Order 38–1 (reprinted in 1 Charles Kappler, *Indian Affairs: Laws and Treaties* 900 (1904)).

**3.** Act of May 5, 1864, ch. 77, 13 Stat. 63.

**4.** *See* Act of May 27, 1902, ch. 888, 32 Stat. 263; J.Res. 31, 57th Cong., 1st Sess., 32 Stat. 744 (1902); Act of March 3, 1903, ch. 994, 32 Stat. 998; Act of April 21, 1904, ch. 1402, 33 Stat.

207; Act of March 3, 1905, ch. 1479, 33 Stat. 1069. (The complete text of this legislation is reprinted in Appendix A to this court's initial memorandum opinion. *See* 521 F.Supp. at 1167–1174.)

**5.** *See* Act of March 3, 1905, ch. 1479, 33 Stat. 1069; Proclamation of July 14, 1905, 34 Stat. 3116 (reprinted in 3 Charles Kappler, *Indian Affairs: Laws and Treaties* 602–605 (1913)).

**6.** Act of May 29, 1908, ch. 218, § 1, 35 Stat. 460, 460–61.

Cheyenne River Sioux Reservation." 465 U.S. at 476, 104 S.Ct. at 1169. Further, *Solem* held that "[n]either the Act of May 29, 1908, the circumstances surrounding its passage, nor subsequent events clearly established that the Act diminished the Cheyenne River Sioux Reservation." 465 U.S. at 481, 104 S.Ct. at 1171. References in some sections of the 1908 Act to "the respective reservations thus diminished," [7] or to timber harvesting on the opened lands "only as long as the lands remain part of the public domain," [8] and even a few references in legislative materials to a "reduced reservation" or to "lands reserved for the use of the Indians on both reservations as diminished," did not add up to a clear expression of congressional intent to diminish either reservation. *Id.* at 474–78, 104 S.Ct. at 1168–70. Importantly, the contemporary and subsequent legislative history of the opening of the Cheyenne River Reservation reflected ambiguities similar to those appearing in the record in *Ute Indian Tribe:* "examples pointing in both directions leave one with the distinct impression that subsequent Congresses had no clear view whether the opened territories were or were not still part of the Cheyenne River Reservation." *Id.* at 479, 104 S.Ct. at 1170.

Relying explicitly on *Solem,* the Tenth Circuit in *Ute Indian Tribe* reasoned:

> The 1902 Act would have returned all surplus Uintah Reservation lands to the public domain if the Ute Tribe's consent could be obtained. That consent was never forthcoming. The Tribe refused all requests to give up their lands. As a result of the impasse, Congress passed additional legislation in 1903 and 1904 extending the time set for opening of the Reservation.... Finally, Congress passed the 1905 Act, opening the Reservation for non-Indian settlement under the homestead and townsite laws. This measure, which actually effected the opening of the Reservation, did not contain the public domain language used in the 1902 Act.
>
> It is not possible to find that the series of congressional enactments summarized

above revealed a "baseline purpose of disestablishment," ... that carried through into the 1905 Act. To do so is inconsistent with the Supreme Court's longstanding directive, reiterated in *Solem,* that in the absence of "substantial and compelling evidence of a congressional intention to diminish Indian lands," the courts' "traditional solicitude for the Indian tribes" must compel a finding that "the old reservation boundaries survived the opening." [465 U.S. at 472,] 104 S.Ct. at 1167. It is impossible to draw disestablishment conclusions or inferences from these congressional statements.

> An examination of the 1902–1905 series of congressional enactments with the proper "solicitude for the Indian tribes," *Solem,* [465 U.S. at 472,] 104 S.Ct. at 1167, provides inferences against diminishment.... The strongest inference that is to be drawn from Congress' actions is that Congress wished surplus Uintah Reservation lands to be put to productive use....

773 F.2d at 1089 (citations omitted). "Congress' use of 'homestead and township acts' language in the 1905 Act, as contrasted with its use of 'public domain language' in the 1902 Act," the Tenth Circuit concluded, "is evidence of a clear retreat from any desire to effect a wholesale diminishment of the Reservation." *Id.* (footnote omitted).

After requesting and receiving a brief from the Solicitor General of the United States concerning the issues presented (478 U.S. 1002, 106 S.Ct. 3291, 92 L.Ed.2d 707 (1986)), the United States Supreme Court denied certiorari on December 1, 1986. *Utah v. Ute Indian Tribe,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986) (mem.).

The State of Utah, not content simply to abide by the Tenth Circuit's judgment in this action (in which it plainly had participated as a party), found opportunity to relitigate the boundary issue in three criminal actions commenced and prosecuted in its name in the Utah state courts. These cases, *State of Utah v. Perank,* [9] *State of Utah v.*

---

**7.** *Id.* at § 2, 35 Stat. 461.

**8.** *Id.* at § 9, 35 Stat. 464.

**9.** 858 P.2d 927 (Utah 1992). In defending a state probation revocation proceeding in 1986, Clinton Perank raised the question of jurisdic-

*Coando,*[10] and *State of Utah v. Hagen,*[11] arose in the Uintah Basin communities of Myton and Roosevelt and involved neither the Ute Indian Tribe nor any of its enrolled tribal members. In one of the three cases, *State v. Perank,* the Utah Supreme Court invited both the Ute Indian Tribe and the United States to file *amicus curiae* briefs, which both did.[12] In none of these cases was the Ute Tribe joined as a party.

On July 17, 1992, the Utah Supreme Court issued opinions in *Perank, Coando* and *Hagen.* Justice Stewart's opinion for the majority in *Perank* announced that court's conclusion that the boundaries of the Uintah Valley Reservation had been diminished, such that the town of Myton was no longer within "Indian country," and elaborated at some length on the majority's reasoning in reaching that result. *See Perank,* 858 P.2d at 933–953.

Almost immediately, the Ute Indian Tribe filed a renewed motion before this court seeking preliminary injunctive relief against any assertion of jurisdiction by the defendants in reliance on the *Perank* decision. Though the motion was fully briefed by the parties and calendared for hearing on August 3, 1992, it was not ruled upon at that time. By stipulation signed by all of the parties to this action, it was agreed that the State and Local Defendants would "refrain from enforcing the Utah Supreme Court's decision in

*State v. Perank,* [858 P.2d 927,] No. 8602433 [sic] (Utah July 17, 1992)," and would "refrain from exercising criminal jurisdiction over Indians who are members of the Ute Indian Tribe or any other federally recognized Indian Tribe," as well as "civil jurisdiction over actions involving the Ute Indian Tribe or members of the Ute Indian Tribe, or interfering, in any way, with the Tribe's exercise of such civil or criminal jurisdiction within the exterior boundaries of the Uintah and Ouray Reservation, Utah," as those boundaries were defined by the Tenth Circuit in *Ute Indian Tribe.* The parties also agreed that the Ute Indian Tribe "shall exercise criminal jurisdiction over Indians who are members of the Ute Indian Tribe or any other federally recognized Indian Tribe" and that the Tribe would "exercise civil and regulatory jurisdiction over Indians and non-Indians to the extent permitted by law within the exterior boundaries" as defined by *Ute Indian Tribe.* This court simply ordered that "the parties shall comply with the provisions of said stipulation," pending this court's ruling on the merits of the Tribe's renewed motion for injunctive relief. Order, dated September 2, 1992, (*nunc pro tunc* to August 3, 1992).

The hearing on the Tribe's renewed motion was reset for December 22, 1992, then rescheduled for April 14, 1993, in light of the filing of a petition for certiorari in the *Hagen*

based upon the *Ute Indian Tribe* decision. Although "[a]ppellate jurisdiction would ordinarily lie with the Utah Court of Appeals," the *Perank* opinion noted that "[b]ecause of the importance of the question presented, the Court of Appeals certified the case to this Court." *Perank,* 858 P.2d at 930 n. 1.

10. 784 P.2d 1228, 1229 (Utah Ct.App.1989) ("The State argues that notwithstanding the *Ute Indian Tribe* decision, Roosevelt is not in Indian country...."), *affirmed,* 858 P.2d 926 (Utah 1992). In *Coando,* the Utah Supreme Court granted certiorari review "to determine whether that court correctly upheld the state's exercise of jurisdiction"—notwithstanding the fact that the Utah Court of Appeals did not reach either the "Indian country" issue or the question whether Coando was an enrolled tribal member—and affirmed Coando's conviction in light of *State v. Perank,* decided the same day, which held that Myton, Utah is not "Indian country." Justice Durham noted that in doing so, "[w]e therefore

affirm his conviction on grounds other than those upon which the court of appeals relied." 858 P.2d at 927.

11. 802 P.2d 745, 747 (Utah Ct.App.1990) ("While we have not been acquainted with the precise arguments advanced by the state in *Perank,* we are hard-pressed to see how, given the Supremacy clause and the doctrine of collateral estoppel, our state courts could reach a contrary decision that would have any practical effect."), *reversed,* 858 P.2d 925 (Utah 1992).

12. In the *Perank* opinion, the Utah Supreme Court noted that the Justice Department filed a copy of the brief originally filed in opposition to the petition for writ of certiorari in the *Ute Indian Tribe* case following the Tenth Circuit's 1985 *en banc* ruling. The brief filed by the Ute Tribe apparently addressed only the threshold question whether defendant Perank was an "Indian" for purposes of 18 U.S.C. § 1151. 858 P.2d at 930–31.

case, (see Order, dated December 17, 1992), and again reset to June 18, 1993, after the Solicitor General of the United States filed a brief regarding the certiorari petition. See Order, dated March 26, 1993. Upon the grant of certiorari by the Supreme Court in the *Hagen* case, this court stayed further proceedings in this action pending the outcome of that appeal. See Order, dated April 29, 1993.[13]

On February 23, 1994, the United States Supreme Court announced its decision in *Hagen*, holding that the Uintah Valley Reservation had been diminished by Congress when its unallotted and unreserved lands were "opened" to non-Indian settlers pursuant to the 1902 Act, and therefore, that Myton, Utah was not within "Indian country" within the meaning of 18 U.S.C. § 1151 (1988 ed.). *Hagen v. Utah*, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994).

The announcement of the *Hagen* decision provoked a flurry of motion practice in this proceeding. The State and Local Defendants filed a motion to dissolve the September 2, 1992 Order of this court preserving the jurisdictional status quo, and then on April 27, 1994, a "Motion for Emergency Relief" concerning the exercise of criminal jurisdiction, which was calendared for hearing on May 2, 1994.[14] Following that hearing, this court entered an Order modifying the September 2, 1992 Order "to allow the State and Local Defendants to prosecute felony crimes occurring on lands within the original boundaries of the Uintah Valley Reservation which are not "Indian country" as defined by 18 U.S.C. § 1151, et seq." Order, dated May 2, 1994. At the May 2, 1994 hearing, this court scheduled a hearing on all pending motions for June 7, 1994, which was continued at the request of the parties until August 2, 1994, with briefs to be filed during July.[15] On July 15, 1994, the Tribe filed its Brief of Plaintiff Ute Indian Tribe in Opposition to Defendants' Motion to Dissolve Preliminary Injunction ("Brief of Ute Indian Tribe");[16] on July 26, 1994, the defendants filed the State and Local Defendants' Memorandum in Opposition to the Ute Tribe's Motion for Injunctive Relief ("Defendants' Memorandum");[17] and on July 29, 1994, the Government filed the United States' Memorandum as *Amicus Curiae* in Response to the State of Utah's Motion to Vacate and Set Aside the Preliminary Injunction ("United States' Memorandum").[18]

---

**13.** The State of Utah also filed motions before the Utah Supreme Court to stay issuance of that court's remittitur in the *Perank, Coando* and *Hagen* cases, which was granted "pending (1) the conclusion of any proceedings on certiorari in the United States Supreme Court … and (2) the final disposition of the injunction proceeding pending in the United States District Court for the District of Utah, *Ute Indian Tribe v. State of Utah, et al.*, [521 F.Supp. 1072,] Civil No. C75–408. Until this Court lifts the stay, the decision in *State v. Perank*, … shall not be relied on as precedent by any lower court." *Perank*, 858 P.2d at 930 (Utah 1993).

**14.** This motion was filed shortly after the Supreme Court's denial of a petition for rehearing in *Hagen*. See *Hagen v. Utah*, —— U.S. ——, 114 S.Ct. 1580, 128 L.Ed.2d 222 (1994).

**15.** Upon an informal request by counsel, the matter was again set down for a status conference on July 14, 1994, but no one appeared. See Minute Entry, dated July 14, 1994.

**16.** Previously, the Tribe had filed its Brief in Support of Permanent Injunction, dated September 25, 1992, as well as the Tribe's Reply Brief in Support of Permanent Injunction, filed December 17, 1992, both of which predate *Hagen*.

Counsel for the Tribe submitted additional materials by Letter, dated September 1, 1994, including the slip opinion in *Chickasaw Nation v. Oklahoma ex rel. Oklahoma Tax Comm'n*, 31 F.3d 964 (10th Cir.1994) and a memorandum opinion prepared by the Regional Solicitor, U.S. Department of the Interior, dated July 7, 1994, concerning the impact of *Hagen* on federal, state and tribal jurisdiction within the Uintah Basin.

**17.** While the State and Local Defendants filed no memorandum accompanying their Motion to Vacate and Set Aside Preliminary Injunction and to Dismiss Plaintiff's Motion for Permanent Injunctive Relief, dated April 25, 1994, they had filed several prior memoranda, including the State and Local Defendants' Response in Opposition to the Tribe's Request for Permanent Injunction, dated November 23, 1992, and the State and Local Defendants' Reply to the *Amicus Curiae* Memorandum of the United States, dated December 11, 1992.

**18.** The Government had also filed a prior Memorandum as *Amicus Curiae* in Support of Ute Indian Tribe's Motion for Injunctive Relief, dated November 23, 1992.

At the request of counsel, the August 2, 1994 hearing was conducted as a status or pretrial conference, at which time this court set a hearing on the merits for September 12, 1994, with the proposed pretrial order to be prepared and submitted by counsel on or before August 12, 1994. *See* Minute Entry, dated August 2, 1994.[19] By stipulation of counsel, the time for filing the proposed pretrial order was extended to August 19, 1994. *See* Order, dated August 22, 1994. The proposed Pretrial Order Concerning "Indian Country" Issues was received on August 19, 1994, signed by the court on September 9, and entered on September 12, 1994, prior to the hearing on the merits.

At the September 12, 1994 hearing, arguments of counsel on the legal issues outlined in the Pretrial Order were heard at length. *See* Transcript of Hearing, dated September 12, 1994, *passim.* Noting that "with the added gloss on what was done early on, the effort to mesh those into something that makes sense, is obviously something that will require some effort," this court took the matter under advisement. *Id.* at 72:19–22.[20]

**Issues Now Before This Court**

At the outset, it seems worthwhile to define the particular issue or issues now in dispute, and to do so with some care. In approaching the questions raised by the parties' motions, this court has read and reread *Hagen* with some care. *Hagen* determined "that the Uintah Indian Reservation has been diminished by Congress," *i.e.,* that the original boundary of the Uintah Valley Reservation does *not* currently define the present territorial extent of federal, state and tribal jurisdiction in the Uintah Basin. 510

U.S. at 419–21, 114 S.Ct. at 970. However, the *Hagen* opinion makes no attempt to define with particularity what the current boundary *is.*

The Pretrial Order Concerning "Indian Country" Issues ("Pretrial Order"), prepared by counsel and entered by the court on September 12, 1994, identifies, *inter alia,* the following issues as currently being in dispute:

A. In spite of *Hagen,* are the State and Local Defendants precluded as a matter of law or equity under the doctrine of collateral estoppel or otherwise, from asserting jurisdiction over the Tribe or its members within the exterior boundaries of the Uintah and Ouray Reservation, as those boundaries were defined in *Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir.1985), *cert. den.* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986)?

B. Although the U.S. Supreme Court denied the Tribe leave to intervene as a party in *Hagen,* is the Supreme Court's decision binding on the Tribe and its members in this action under the doctrine of *stare decisis* or otherwise?

C. In light of *Hagen,* do any or all of the following categories of fee land constitute "Indian Country" under 18 U.S.C. § 1151: (a) land that was apportioned to the "Mixed–Blood" Utes under the Ute Partition Act; (b) lands allotted to individual Indians that have passed into fee status after 1905; and (c) lands that were held in trust after the Reservation was opened in 1905 but that since have been exchanged into fee status by the Tribe for then-fee (now trust) lands in an effort to consolidate its land holdings[?]

---

**19.** At that time, counsel for Roosevelt City made what amounted to a "speaking motion" for immediate relief from the court's September 2, 1992 Order as modified by the May 2, 1994 Order, on the theory that "it is acknowledged by the Ute Tribe and the United States and all the parties here that Roosevelt City is no longer within Indian country." Transcript of Hearing, dated August 2, 1994, at 24:17–20. Roosevelt City having filed no formal request for immediate relief, this court made no formal ruling at that time.

**20.** Since that time, several individual Indian criminal defendants whose offense conduct oc-

curred within "Indian country" as delineated in *Ute Indian Tribe* have filed motions for relief pursuant to 28 U.S.C. § 2255 (1994). In *United States v. Cuch,* 875 F.Supp. 767 (D.Utah 1995), Judge Sam ruled that the governing law concerning jurisdiction over defendant Cuch at the time of his conviction was the Tenth Circuit's *en banc* ruling in *Ute Indian Tribe* and that the *Hagen* decision did not apply retroactively to alter that result. The Tenth Circuit's decision in *Cuch,* announced March 21, 1996, affirms Judge Sam's ruling and sheds some additional light on the Tenth Circuit's reading of *Ute Indian Tribe* after *Hagen,* particularly as it pertains to cases decided before *Hagen.* More about that later....

*Id.* at 14–15. Before reaching the issues addressed in Paragraphs 5.A and 5.B of the Pretrial Order, it makes sense to examine to what extent the decision of the United States Supreme Court in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), stands in genuine conflict with the Tenth Circuit's *en banc* ruling in *Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir. 1985), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The res judicata, collateral estoppel or other binding effect of the Tenth Circuit's judgment in *Ute Indian Tribe* comes into question in this proceeding only insofar as *Ute Indian Tribe* and *Hagen* cannot be reconciled. The land category issues identified in Paragraph 5.C of the Pretrial Order would also appear to be subsumed within this more fundamental question.

**The Uintah Reservation Boundaries After Hagen**

Let us begin with those questions as to which *Ute Indian Tribe* and *Hagen* are in accord—those issues which are *not* in dispute. First, there is no question that the jurisdiction of the Ute Indian Tribe encompasses all of the lands now held in trust by the United States for the benefit of the Tribe and its members, or where Indian allotments are concerned, lands now held in trust for the benefit of individual Ute allottees. *See* Pretrial Order Concerning "Indian Country" Issues, dated September 12, 1994, at 13 ¶ 3.M. Altogether, this represents approximately 1.2 million acres of land. Nor did *Hagen* address the Tenth Circuit's determination in *Ute Indian Tribe* that the 1905 national forest withdrawals of approximately 1,010,000 acres of reservation land did not diminish the Uintah Reservation boundaries. *Hagen* also makes no ruling concerning the boundaries of the Uncompahgre Reservation, the original extent of which was reaffirmed by the Tenth Circuit. The Ute Indian Tribe suggests that "the legal status of the non-opened lands on the Uintah Valley Reservation and all of the lands on the Uncompahgre

Reservation remain[s] as established by the Tenth Circuit in *Ute Indian Tribe v. Utah,* 773 F.2d 1087 (10th Cir.1985), *cert. denied,* 479 U.S. 994[, 107 S.Ct. 596, 93 L.Ed.2d 596] (1986)." Brief of Ute Indian Tribe, at 2 n. 4; *see id.* at 15 n. 19. *Accord, State of Utah v. Perank,* 858 P.2d 927, 934 (Utah 1992).

The present controversy thus "centers on whether the State or the Tribe and federal government have jurisdiction over the various categories of *non-trust,* i.e., fee, lands within the Uintah Valley Reservation," (Brief of Ute Indian Tribe at 15 (emphasis added & footnote omitted)), and therefore concerns the extent to which *Hagen* supplants *Ute Indian Tribe*'s reaffirmation of continuing federal and tribal jurisdiction within the Reservation's original exterior boundaries.

The United States, appearing in this proceeding as an *amicus curiae,* attempts to minimize the practical impact of *Hagen* on the jurisdictional landscape mapped in *Ute Indian Tribe:* because the 1905 Act expressly provided that the "unallotted lands ... shall be disposed of under the general provisions of the homestead and townsite laws of the United States," the reservation was diminished only to the extent of the lands "actually entered by non-Indians under the 1905 Act and not subsequently reacquired by the Tribe and taken into trust status." United States' Memorandum, dated July 29, 1994, at 9. Moreover, "any parcels of land, though currently held in fee, that were never opened to non-Indian settlement under the 1905 Act remain 'Indian country'." *Id.* at 13.[21]

The Tribe joins the Government in asserting that *Hagen*'s "only effect is to separate from 'Indian country' those lands that were *actually settled* pursuant to the 1905 Presidential Proclamation," noting that "the present disagreement centers on whether the State or the Tribe and federal government have jurisdiction over the various categories of non-trust, i.e., fee, lands within the Uintah Valley Reservation." Brief of Ute Indian Tribe at 13, 15 (emphasis added). The Tribe

**21.** According to the Government, "This category includes those fee lands that were initially Indian allotments that have become fee under a number of circumstances, as well as those lands that

were distributed in fee status to former members of the Tribe or others under the Ute Partition Act, 25 U.S.C. §§ 677–677aa." *Id.*

identifies four categories of non-trust land within the Reservation:

> (1) lands that passed from trust to fee status under the 1905 Presidential Proclamation; (2) lands that were initially allotted to tribal members under the Act of May 27, 1902, ch. 888, 32 Stat. 245, which have since passed into fee status (whether owned by an Indian or non-Indian); (3) 211,430 acres of land ... that were distributed to former members of the Tribe under the Ute Partition Act ...; and (4) former trust lands that passed into fee when they were exchanged by the Tribe for fee lands under the Indian Reorganization Act ... and [the] Indian Land Consolidation Act....

*Id.* at 16 (citations omitted). According to the Tribe, only the first category of non-trust lands are no longer "Indian country" within the meaning of 18 U.S.C.A. § 1151 (1984). The Tribe even points to language in the Utah Supreme Court's opinion in *Perank* as support for this view: " 'The only issue in this case ... is whether the unallotted and unreserved lands that *were opened to entry in 1905* and not later restored to tribal ownership and jurisdiction ... are within the present boundaries of the Reservation.' " *Id.* at 18 (quoting *Perank,* 858 P.2d at 934 (emphasis supplied by the Tribe; footnote omitted)).

Setting aside for a moment the semantic distinction between lands that "were opened to entry" under the 1905 Act (*Perank* ) and lands that were "actually settled" (Tribe), the Tribe correctly points out that on their facts, both *Perank* and *Hagen* addressed conduct occurring in Myton, Utah, "which was established within the original boundaries of the Uintah Indian Reservation when the Reservation was opened to non-Indian settlement in 1905." *Hagen,* 510 U.S. at 408, 114 S.Ct. at 964. Indeed, Myton was established by Presidential Proclamation, together with the

towns of Duchesne and Randlett. *See* 34 Stat. 3139, 3142. Plats of the Reserved Townsite of Myton were approved on September 13, 1905, by the United States General Land Office and on August 26, 1919, by the United States Surveyor General.[22] Thus Myton comes within the first category of non-trust lands listed by the Tribe, at least as to lands patented in fee, and in its entirety as lands "opened to entry" under *Perank.*

■ "Indian country" within the meaning of 18 U.S.C.A. § 1151(a) (1984) encompasses "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." Thus, non-trust, or fee lands may be found within "Indian country" so long as there are identifiable "limits of any Indian reservation" embracing those lands.[23] Neither *Hagen* nor *Perank* determined the "Indian country" status of non-trust lands falling into any of the other three categories listed by the Tribe, or in Paragraph 5.C of the Pretrial Order because neither case involved conduct occurring on those lands. The Tribe and the United States suggest that the three remaining categories of non-trust lands not before the Court in *Hagen* remain "Indian country" because they are within the Uintah Reservation's "limits" for purposes of § 1151(a).

The State and Local Defendants emphatically dispute the theory advanced by the Tribe and by the United States: "If the boundaries *were* diminished, then it was recognized by all involved that tribal jurisdiction necessarily was limited to trust lands.... Once this diminishment of the exterior boundaries occurred, lands leaving trust status for any reason lost their status as 'Indian country' under 18 U.S.C. § 1151(a)." Defendants' Memorandum at 12 (emphasis in original).[24] In essence, the

---

22. *See* Defendants' Memorandum at 25 n. 19.

23. As the Tenth Circuit has recently observed, "both the Supreme Court and this Court have concluded § 1151 defines Indian country for both civil and criminal jurisdiction purposes." *Pittsburg & Midway Coal Mining Co. v. Watch-*

*man,* 52 F.3d 1531, 1540–1541 & n. 10 (10th Cir.1995).

24. The defendants hasten to point out that in addressing the question before the Supreme Court in *Hagen,* both the petitioner and the Tribe argued that a finding of "diminishment" would divest the Tribe and the United States of jurisdic-

State and Local Defendants now argue that the Uintah Reservation was wholly terminated or extinguished by the 1902 Act and that thereafter no discrete, definable reservation boundaries exist. For purposes of § 1151(a), then, the only existing "limits" of the Uintah Reservation after 1905 are those that distinguish Indian lands held in trust from Indian and non-Indian lands held in fee. Indeed, this "'Indian country' equals trust lands" equation represents the central thrust of the Defendants' arguments in this proceeding. **The Uintah Reservation: "Diminished" or "Terminated"?**

As is so often the case, the problem confounding court and counsel proves to be largely one of semantics. When *Hagen* speaks of the "question whether the Uintah Reservation has been *diminished,*" that is, "made smaller; lessened; reduced ..." (*Webster's New World Dictionary* 386 (3d coll. ed. 1991)), the terminology itself implies a continued existence, albeit reduced in size, according to commonly understood usage. In essence, the Tribe and the United States argue that the limits of the Uintah Reservation have been "diminished" by being reduced only to the extent of issuance of fee patents resulting from non-Indian settlement

under the 1905 Act. Conversely, the State and Local Defendants argue that the limits of the Uintah Reservation have been "diminished," that is, *extinguished,* rendering § 1151(a) inapplicable to all four disputed categories of non-trust lands. The concept urged by the State and Local Defendants may more accurately be termed the *disestablishment* of a reservation, i.e., "to deprive of the status of being established," (*id.* at 393), or its *termination,* i.e., "the end of something in space and time," (*id.* at 1381), rather than a genuine diminishment. *See also Ute Indian Tribe,* 521 F.Supp. at 1085–1092.[25]

Yet when winnowed down to its precise holding, *Hagen* says this:

> [W]e hold that the restoration of unallotted reservation lands to the public domain evidences a congressional intent with respect to those lands inconsistent with the continuation of reservation status. Thus, the existence of such language in the operative section of a surplus land Act indicates that the Act diminished the reservation....

510 U.S. at 414, 114 S.Ct. at 967.[26] Thus, the discontinuation of reservation status, or "diminishment" of the Reservation, was effective *"with respect to those lands,"* plainly

---

tion over the non-trust lands. *Id.* at 13–14. This would indeed be the case had the Court found *the entire reservation* to have been "disestablished," or "terminated," as in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

**25.** The word *terminate* has also been used in this context. *See, e.g., Mattz v. Arnett,* 412 U.S. 481, 495, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973) ("A congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."); *DeCoteau v. District County Court,* 420 U.S. 425, 444–45, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975) ("the Lake Traverse Reservation was terminated in 1891").

**26.** The State and Local Defendants quote the next sentence of the *Hagen* opinion, supplying emphasis as indicated:

> Indeed, we have found only one case in which a Federal Court of Appeals decided that statutory restoration language did not *terminate* a reservation, *Ute Indian Tribe,* 773 F.2d at 1092, a conclusion the Tenth Circuit has since disavowed as "unexamined and unsupported."

*Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387, 1400, *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). Defendants' Memorandum at 16 (quoting *Hagen,* 510 U.S. at 414, 114 S.Ct. at 967). Of course, Justice O'Connor is citing to the portion of *Ute Indian Tribe* opinion discussing the restoration of the *Uncompahgre Reservation* to the public domain in the 1894 and 1897 Acts—not the opening of the Uintah Reservation in 1905. *Compare* 773 F.2d at 1090–1093 ("III. THE UNCOMPAHGRE RESERVATION") *with id.* at 1088–1089 ("I. THE UINTAH ISSUE"). Likewise, the reference in *Yazzie* to the "unexamined and unsupported" conclusion in *Ute Indian Tribe* concerns only the 1985 ruling as to the Uncompahgre Reservation. *Yazzie* recounts the analysis of the opening of the Uintah Reservation in favorable terms, restating its conclusion that "restoration language was not the operative language of the statute being construed," *viz.,* the 1905 Act. *Yazzie,* 909 F.2d at 1399–1400.

This distinction is also lost upon Wendy L. Slater, *"Pulling up the Nails" from the Uintah Indian Reservation Boundary: Hagen v. Utah,* 28 Creighton L.Rev. 529, 546 (1995) ("The court noted that its decision in *Ute* was 'unexamined and unsupported in the opinion.'" (footnote omitted)).

referring to the "unallotted reservation lands," the lands restored to the public domain and "opened to entry" and settlement pursuant to the 1902–1905 Acts.

Justice O'Connor's phrasing of the holding in *Hagen* parallels Justice Stewart's framing of the statutory construction issue in *Perank:* "whether the language of the Act of May 27, 1902, which provided that the unallotted lands were to be 'restored to the public domain,' if used as operative statutory language opening a reservation would effect a diminishment of that reservation *as to the lands so restored.*" 858 P.2d at 934 (emphasis added). Justice Stewart articulated the court's holding in *Perank* in like terms: "We hold that the restoration language in the 1902 Act established the necessary congressional intent to diminish the Reservation *as to those lands restored to the public domain* and that the restoration language in the 1902 Act remained operative statutory language when the Reservation was opened in 1905." *Id.* (emphasis added).

■ As this court noted when first addressing the boundary issue in 1981, there exists a canon of statutory construction in reservation boundary cases "forbidding any assumption 'that Congress would intend to change the reservation to an area without defined boundaries and, in addition, create a confusing checkerboard pattern of jurisdiction.'" *Ute Indian Tribe,* 521 F.Supp. at 1154 (quoting *United States v. Long Elk,* 565 F.2d 1032, 1039 (8th Cir.1977)). Yet the State and Local Defendants suggest that in construing the 1905 Act opening the Uintah Reservation in *Hagen,* the Supreme Court assumed exactly that.

■ Nothing in the legislation pertaining to the Uintah Reservation expresses a congressional purpose to extinguish or terminate the Uintah Reservation in its entirety. Rather, Congress expressly provided that the Utes would retain more reservation land than merely their individual allotments. As *Hagen* explains, "A month after the passage of the 1902 Act, Congress directed the Secre-

tary of the Interior to set apart sufficient land to serve the grazing needs of the Indians remaining on the Reservation. J.Res. 31, 57th Cong., 1st Sess. (1902), 32 Stat. 744." 510 U.S. at 404, 114 S.Ct. at 962 (footnote omitted). In Congress' own words, the Secretary was directed to "select and set apart for the use in common of the Indians of that reservation such an amount of non-irrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock." In 1903, Congress again addressed the reservation grazing lands, limiting the selection to "the lands south of the Strawberry River on said Uintah Reservation" and providing that the lands "shall not exceed two hundred and fifty thousand acres...." Act of March 3, 1903, ch. 994, 32 Stat. 998. The 1905 Act "repealed the provision of the 1903 Act limiting the grazing lands to areas south of the Strawberry River," (*Hagen,* 510 U.S. at 406, 114 S.Ct. at 963), leaving the reserved grazing lands requirement otherwise intact. Act of March 3, 1905, ch. 1479, 33 Stat. 1069. Thus, in the opening legislation affecting the Uintah Reservation, Congress visualized an "unopened" portion of the Reservation consisting not only of individual Indian allotments but also of a quarter-million acres of grazing land "for the use in common of the Indians of that reservation." [27] Even the oft-quoted 1903 "councils" of Indian Inspector James McLaughlin with the Utes residing on the Uintah Reservation acknowledge this:

> [INSPECTOR McLAUGHLIN]: You say that [reservation boundary] line is very heavy and that the reservation is nailed down upon the border. That is very true as applying to the past many years and up to now, but [C]ongress has provided legislation which will pull up the nails which hold down that line and after next year there will be no outside boundary line to this reservation. *Each of you will have a boundary to your individual holdings and there will also be a border to that 250,000 acre tract set apart for pasturage.* You

---

**27.** In *Perank,* Justice Stewart noted that "[t]he allotments to individual Indians under the 1902 Act and the lands reserved for grazing and other purposes set aside for the Tribe by a 1902 Joint Resolution and the 1903 and 1905 Acts make up approximately 360,000 acres." 858 P.2d at 934 n. 10.

fear that you are going to be confined to the tract of land allotted. That is not so, ... [W]hen you take your allotments you can travel like white men and you will not need a pass. *Your Agency will be continued just the same as now; the Agent will have full jurisdiction just the same as now, to protect your interests,* and as citizens you will have the protection of the laws of the state to redress injuries against you.

JX 162 at 42–45 (emphasis added) (quoted in Brief for the Respondent, *Hagen v. Utah,* 1993 WL 384805, at Appendix C, at 5a–6a).

Nowhere in *Hagen* or *Perank* does either court find that the Uintah Reservation was "disestablished" or "terminated" altogether, or conclude, as the Supreme Court did twenty years earlier in *DeCoteau,* that "the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs" and that the reservation itself was terminated. 420 U.S. at 446, 95 S.Ct. at 1094. To the contrary, Justice Stewart observed in *Perank* that "all parties agree that *the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use.*" 858

P.2d at 934 (emphasis added). Thus the Uintah Reservation, though dramatically reduced in size, continued to exist after 1905 as an Indian reservation with definable "limits" within the meaning of 18 U.S.C. § 1151(a), and the lands encompassed by its diminished boundaries remain within "Indian country" under the statute.

Judge Monroe McKay, writing for the court of appeals in *Chickasaw Nation v. State ex rel. Oklahoma Tax Comm'n,* 31 F.3d 964 (10th Cir.1994), *affirmed in part, reversed in part on other grounds and remanded,* —— U.S. ——, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995), expressed essentially this same view:

> In *Hagen,* the Court concluded that the Uintah reservation had been "diminished" by various acts of Congress, and that therefore a town originally within the reservation was now outside the reservation and subject to state criminal jurisdiction. Notwithstanding the diminishment of the Uintah reservation in *Hagen,* there was no question but that *the land within the diminished reservation retained its status as Indian country.*

31 F.3d at 976 n. 8 (emphasis added).[28] Even more recently, in *United States v.*

---

**28.** The State of Utah argues that *Chickasaw Nation* in fact ratifies its "Indian country-equals-trust lands" equation and that Judge McKay's reference to "land within the diminished reservation" speaks only of trust lands—wholly consistent with the State's theory of wholesale disestablishment. *See* Transcript of Hearing, September 12, 1994, at 20:14–21:12 (Mr. Andrews).

Judge McKay's opinion echoes the Supreme Court's holding in *Oklahoma Tax Comm'n v. Sac and Fox Nation,* 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993), that the limits imposed by *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and its progeny upon a state's power to tax the income of tribal members "applies to all Indian country, and not just formal reservations," and that the crucial question is "whether the relevant tribal members live in Indian country—whether the land is within reservation boundaries, on allotted lands, or in dependent communities." 508 U.S. at 125, 126, 113 S.Ct. at 1991, 1992. *Sac and Fox* to tax, citing *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), a case involving Indian tribal trust lands located outside of a formal reservation. *Id.* at 124–25, 113 S.Ct. at 1991. "Congress has defined Indian country

broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, ..." *Sac and Fox, Id.* at 123, 113 S.Ct. at 1990.

*Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967 (10th Cir.1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988), expressly equates "reservation" lands with "[T]ribal lands, trust lands, or certain allotted lands," with reference to their common status as "Indian country" under 18 U.S.C. § 1151. Nothing in *Indian Country, U.S.A.* asserts that "reservation" or "Indian country" status under 18 U.S.C. § 1151(a) is dependent on or limited by Indian title or trust status. Nor does it suggest that once Indian tribal or trust land acquires "Indian country" status under § 1151(a), subsequent "issuance of any patent" in fee to § 1151(a) lands somehow divests the patented lands of "Indian country" status.

In footnote 8 of *Chickasaw,* Judge McKay quoted the *Indian Country, U.S.A.* opinion for the proposition that "[t]ribal lands, trust lands, and certain allotted lands generally remain Indian country despite disestablishment." 829 F.2d at 975 n. 3 (Seymour, J.). In then observing that under *Hagen* "the land within the diminished reservation retained its status as Indian coun-

*Cuch,* 79 F.3d 987 (10th Cir.1996), the Tenth Circuit described the effect of *Hagen* in these terms: "[t]he *Hagen* decision effectively overruled the contrary conclusion reached in the *Ute Indian Tribe* case, *redefined the Reservation boundaries* resulting from our earlier decision, and conclusively settled the question." *Cuch,* 79 F.3d at 989 (emphasis added). Judge Stephen Anderson, writing for the court of appeals in *Cuch,* reads *Hagen* as holding that "the state had jurisdiction to prosecute Hagen because Congress had diminished the Uintah Reservation in the early 1900s." *Id.* In this context *diminishment* "redefined the Reservation boundaries" previously established in *Ute Indian Tribe,* but with no indication that the Uintah Reservation was terminated or disestablished altogether.

In this respect, *Rosebud Sioux Tribe v. Kneip* also proves instructive. In *Rosebud,* the Court speaks of a reservation *diminished* (430 U.S. at 585, 586, 587, 588, 594, 598, 611, 614, 97 S.Ct. at 1362, 1362, 1363, 1363, 1367, 1369, 1375, 1377), of the *diminution* of a reservation by restoration of "opened" unallotted lands (*id.* at 592, 597, 602, 97 S.Ct. at 1366, 1368, 1371), of the *disestablishment* of a particular county "from the Rosebud Reservation," (*id.* at 601, 603, 609, 97 S.Ct. at 1370, 1371, 1374), of congressional intent "to exclude Gregory County from the Rosebud Reservation," (*id.* at 603, 97 S.Ct. at 1371), or "to disestablish the affected [opened, unallotted] areas." *Id.* at 613, 97 S.Ct. at 1376. At page 599, 97 S.Ct. at page 1369 of the *Rosebud* opinion, the Court notes that "[h]ere, for example, unlike the situation in *DeCoteau,* we are not faced with an Act which, if it disestablished the area under question, *would terminate the entire reservation,* 420 U.S., at 446–447, [95 S.Ct., at 1094]." *Id.* at 599 n. 20, 97 S.Ct. at 1369 n. 20 (emphasis added).[29]

*Rosebud* concluded that the language of the Act of April 23, 1904, ch. 1484, 33 Stat. 254, the Act of March 2, 1907, ch. 2536, 34 Stat. 1230, and the Act of May 30, 1910, ch. 260, 36 Stat. 448, affecting the Rosebud Reservation "not only opened the land for settlement, but diminished the boundaries of the Reservation *pro tanto.*" 430 U.S. at 588, 97 S.Ct. at 1363 (footnote omitted).[30] "The intent of Con-

try," this court reads Judge McKay to be referring to land within *an existing reservation* "[n]otwithstanding the diminishment." Footnote 8 thus distinguishes "the diminished reservation" from "[t]ribal lands, trust lands, and certain allotted lands" following "disestablishment," rather than equating the two.

**29.** The distinction between *DeCoteau* and *Rosebud* in this regard has been pointed out by the Eighth Circuit:

> The Indian conduct in *DeCoteau* did occur on non-Indian, unallotted land within the 1867 reservation boundaries. *DeCoteau v. District County Court, supra,* 420 U.S. at 428, 95 S.Ct. at 1082. However, the Supreme Court also concluded that as to this particular land, reservation status had been terminated by the Congressional Act of March 3, 1891, c. 543, 26 Stat. 1035. *DeCoteau v. District County Court, supra,* 420 U.S. at 444–445, 95 S.Ct. 1082. Appellant cites no statute similarly disestablishing the reservation status of Todd County in the Rosebud Reservation.
>
> . . . .
>
> Judge Blackmun in the first *Beardslee* appellate opinion concluded from his research that "(o)nly three Acts of Congress have affected the territory of the reservation since its establishment in 1889 and none of these concern Todd County. * * * No part of the Todd County portion of the reservation has ever been formally opened." *Id.* at 285. Similarly

last year in *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87 (8th Cir.1975), cert. granted, [425] U.S. [989], 96 S.Ct. 2199, 48 L.Ed.2d 814 (1976), where the court dealt with the South Dakota counties of Gregory, Tripp, Lyman, and Mellette, it also added that: "Todd County remains unopened." *Id.* at 88 n. 1 (emphasis added).

*Beardslee v. United States,* 541 F.2d 705, 707, 708 (8th Cir.1976). *See also United States v. Long Elk,* 565 F.2d 1032, 1037, 1038 (8th Cir.1977) (*Rosebud* concluded that "Congress clearly intended to diminish the size of the Rosebud Reservation" and "disestablished the designated portions of the reservation"); *United States ex rel. Cook v. Parkinson,* 525 F.2d 120, 123 (8th Cir. 1975) ("[t]he phrase 'diminished reservation' was interpreted [by the Eighth Circuit] to mean in *Rosebud* that the reservation was reduced geographically"); *Black Hills Institute v. United States Department of Justice,* 812 F.Supp. 1015, 1019 (D.S.D.1993) (*"Rosebud* was a case involving congressional intent as to the disestablishment *of a part of the reservation"* (emphasis added)).

**30.** *pro tanto*—"a defensible Latinism commonly used in the law" meaning "to that extent; as far as it goes." BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 708 (2d ed. 1995). *Accord,* BLACK'S LAW DICTIONARY 1100 (5th ed. 1979) ("for so much; for as much as may be; as far as it goes.")

gress in the 1904, the 1907, and the 1910 Acts was *to change the boundaries of the original 1889 Rosebud Reservation." Id.* at 615, 97 S.Ct. at 1377 (emphasis added).

*Rosebud* illustrates the fact that reservation diminishment is not necessarily the either-or, all-or-nothing, win-or-lose proposition asserted in this proceeding by the State and Local Defendants. In referring to the Uintah Reservation as being *diminished* "with respect to those [unallotted and unreserved] lands," *Hagen* uses the term in the commonly understood sense of being "made smaller, lessened or reduced," as the Court did in *Rosebud. See also White Earth Band of Chippewa Indians v. Alexander,* 518 F.Supp. 527, 534 (D.Minn.1981) (White Earth Chippewa Reservation diminished by cession of four-township tract; remaining thirty-two township reservation area not disestablished), *affirmed,* 683 F.2d 1129 (8th Cir. 1982), *cert. denied,* 459 U.S. 1070, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

*Hagen* also contrasts with *Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387 (10th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990), in which the court of appeals found that the reservation status of a 1907–08 addition to the Navajo Reservation was terminated by language in a 1908 Act as well as 1908 and 1911 Executive Orders which restored the unallotted lands to the public domain. Finding that the 1907–08 "reservation" had been made by Executive Order for the limited purpose of providing allotments to individual Indians, the Tenth Circuit explained: "Especially when a reservation addition is made only for the limited purpose of allotments of some of the land to individual Indians in severalty, the reservation is terminated when the lands are allotted and the remainder restored to the public domain." 909 F.2d at 1420. Therefore, having been made for that limited purpose, the 1907–08 addition to the Navajo Reservation was entirely *"unlike cases where reservation status was created by treaty or statute, or by EO for purposes* broader than mere allotments in severalty," *(id.* (emphasis added))—cases such as the Uintah Reservation, created by Executive Order in 1861 and Act of Congress in 1864 and "set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." Act of May 5, 1864, ch. 77, § 2, 13 Stat. 63. Nothing in *Yazzie* even hints that the termination of the 1907–08 addition affected the boundaries of the remainder of the Navajo Reservation in any way whatsoever.

The 1902–1905 Acts were not the first time that the Uintah Valley Reservation had been diminished by a restoration of particular lands to the public domain. Section 1 of the Act of May 24, 1888, ch. 310, 25 Stat. 157, declared a 7,040–acre parcel known as the Gilsonite Strip "to be public lands of the United States and restored to the public domain." It was clearly understood at that time that the restoration of the Gilsonite Strip to the public domain represented a diminishment of the Reservation.[31] It was equally plain that the balance of the Reservation not so restored remained intact as a reservation. *See Ute Indian Tribe,* 521 F.Supp. at 1098–1100.

The view expressed in *Perank* that "the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use," corresponds with subsequent congressional treatment of the matter, including references in legislative materials to "the exterior boundary of the Uintah and Ouray Reservation." *See Ute Indian Tribe,* 521 F.Supp. at 1133–1134. Moreover, the boundaries of the Uintah Reservation, though reduced in 1905, were not then frozen in place; they became the subject of further legislative adjustments. *See Perank,* 858 P.2d at 934 & n. 10.

In the aftermath of the demise of the Indian allotment policy, Congress and the United States Department of the Interior

---

**31.** A November 18, 1895 letter from the Commissioner of Indian Affairs to the Secretary of the Interior commented that the 1888 Act "had been fully executed in accordance with its intent so far as the securing of the consent of the Indians to *the diminution of their reservation* and the restoration of said strip of land to the public domain, . . ." *Ute Indian Tribe,* 521 F.Supp. at 1100 (emphasis added).

have taken steps to restore thousands of acres of vacant "opened" lands to the Reservation. Section 3 of the Wheeler–Howard Act, or Indian Reorganization Act of 1934,[32] 25 U.S.C.A. § 463 (Supp.1996), reads in part:

> [t]he Secretary of the Interior, if he shall find it to be in the public interest, is authorized to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public-land laws of the United States,

provided that valid existing claims are not affected. On August 25, 1945, Secretary of the Interior Harold Ickes issued an Order of Restoration directing that the "undisposed-of opened lands of the Uintah and Ouray Reservation ... are hereby restored to tribal ownership for the use and benefit of the Ute Indian Tribe ..., and *are added to and made a part of the existing reservation,* subject to any valid existing rights." 10 Fed.Reg. 12409 (1945) (emphasis added).[33] Further, the Act of March 11, 1948, ch. 108, 62 Stat. 72, expressly provided that "the exterior boundary of the Uintah and Ouray Reservation ... for the benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation, is hereby extended to include the following area: ...," followed by a lengthy legal description encompassing an area of grazing lands known as the Hill Creek Extension.

If, as the State and Local Defendants now suggest, the "Uintah and Ouray Reservation" consists merely of an aggregation of parcels of Indian trust lands, why did Congress speak of extending the Reservation's "exterior boundary"? Congress in 1948 was aware of the distinction. Three months after extending the Reservation boundaries to embrace the Hill Creek Extension, "Congress uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians within reservation boundaries. See Act of June 25, 1948, ch. 645, 62 Stat. 757 (codified at 18 U.S.C. § 1151 (1982 ed.))." *Solem,* 465 U.S. at 468, 104 S.Ct. at 1164.

The State and Local Defendants' contention that *Hagen* leaves the Uintah Valley portion of the Uintah and Ouray Reservation "an area without defined boundaries" cannot survive careful scrutiny of the operative language of the 1902 Act and subsequent legislation, particularly when read in light of the explicit holding of the *Hagen* case, buttressed by the consistent language of the *Perank* opinion. Because "the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use," and also as to lands later restored to the Reservation by congressional or administrative action (*see Perank,* 858 P.2d at 934), the State and Local Defendants' simplistic " 'Indian country'-equals-trust lands" equation cannot accurately define the jurisdictional landscape of the Uintah Reservation, even as diminished.[34] Other cases involving ter-

---

**32.** Act of June 18, 1934, ch. 576, 48 Stat. 984.

**33.** As acknowledged by the parties in this proceeding, "Regardless of whether the original reservation was diminished, ... opened lands that have been restored to reservation status by subsequent Acts of Congress, see *e.g.,* Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified at 25 U.S.C. § 461 *et seq.* (1982 ed.) (authorizing the return of opened lands to the original reservations)), fall within the exclusive criminal jurisdiction of federal and tribal courts under 18 U.S.C. §§ 1152, 1153." *Solem,* 465 U.S. at 467 n. 8, 104 S.Ct. at 1164 n. 8.

Similarly, the 1983 panel opinion in *Ute Indian Tribe,* referring to the 1945 Order of Restoration, observed: "Neither party disputes that the restorations accomplished pursuant to § 463 of 25 U.S.C. made them part of the reservation. We agree. This restoration included about 217,000

acres." 716 F.2d 1298, 1312–1313 (10th Cir. 1983) (Seth, C.J.). *Accord, Perank,* 858 P.2d at 950 ("[T]he return of those lands to the reservation would enlarge the boundaries of the reservation. *See Solem,* 465 U.S., at 467–68, [104 S.Ct. at 1164,] ...").

**34.** Particularly as to tribal lands held in trust, the defendants' assertion that "Indian country" status ends "when lands leave trust status" (Defendants' Memorandum at 20) appears to repudiate the express terms of the statute, 18 U.S.C. § 1151(a), in favor of earlier definitions under which "Indian country" included "only those lands in which the Indians held some form of property interest...." (*Solem,* 465 U.S. at 468, 104 S.Ct. at 1164), and where land continued to be Indian country "so long as the Indians had the title to it, and no longer." *Bates v. Clark,* 95 U.S. 204, 208, 24 L.Ed. 471 (1877). As the Court pointed out in *Solem,* Congress "uncouple[d] res-

minated or wholly disestablished reservations having only scattered allotments remaining (*e.g., DeCoteau, Yazzie*) are simply inapposite to the case at bar.

## Extent of the 1905 Diminishment of the Uintah Reservation

In *Perank*, Justice Stewart wrote, "The only issue in this case ... is whether the unallotted and unreserved lands that were opened to entry in 1905 and not later restored to tribal ownership and jurisdiction by the 1945 'Order of Restoration' are within the present boundaries of the Reservation," (858 P.2d at 934)—which brings us back to the distinction between lands "opened to entry in 1905" and opened lands "actually settled" under the 1905 Act.

The narrower reading proffered by the Tribe and the United States as to the effect of *Hagen*—lands "actually settled" under the 1905 Act—harmonizes with this court's original treatment of the 1905 Act, *viz.*, as legislation having some substantive effect *vis-a-vis* the 1902 Act. *See Ute Indian Tribe*, 521 F.Supp. at 1123–1132. It strikes a more dissonant chord when contrasted with the

reading given the 1905 Act in the *Hagen* and *Perank* opinions. Both *Hagen* and *Perank* read the 1902 Act as restoring *all* unallotted and otherwise unreserved lands within the Uintah Reservation to the public domain. Further, both *Hagen* and *Perank* read the 1905 Act as making no substantive change in the operation of restoration language of the 1902 Act.[35] Indeed, it is on this precise point that *Perank* and *Ute Indian Tribe* disagree, and the United States Supreme Court granted certiorari in *Hagen* expressly "to resolve the direct conflict between these decisions of the Tenth Circuit and the Utah Supreme Court on the question whether the Uintah Reservation has been diminished." 510 U.S. at 409, 114 S.Ct. at 964.

Through and including *Hagen*, the Supreme Court's line of reservation boundary cases invoke two rules of statutory construction: that "the statutory language must 'establis[h] an express congressional purpose to diminish,'" (510 U.S. at 411, 114 S.Ct. at 965 (quoting *Solem*, 465 U.S. at 475, 104 S.Ct. at 1168), and that "[t]hroughout the inquiry, we resolve any ambiguities in favor of the Indians, and we will not lightly find diminish-

---

ervation status from Indian ownership" by enacting 18 U.S.C. § 1151(a) in 1948. 465 U.S. at 468, 104 S.Ct. at 1164. As to lands held by the United States in trust for a tribe, the court can find no authority suggesting that a finding of diminishment alters the language or effect of § 1151(a) in any way. *See* pages 1498–1500 *infra*.

**35.** The *Hagen* majority limits the effect of the 1905 Act by minimizing its purpose: "[A]lthough we have no way of knowing for sure why the Senate decided to limit the 'manner' of opening, it seems likely that Congress wanted to limit land speculation. That objective is not inconsistent with the restoration of the unallotted lands to the public domain...." 114 S.Ct. at 969. As this court observed the first time around, Senator Henry M. Teller of Colorado, a leading architect of the Senate language adopted in the 1905 Act, "had long opposed the allotment of Indian lands and *wholesale opening of reservations to white settlement under the allotment bills*, charging that such legislation was in the interests of non-Indian land speculators." *Ute Indian Tribe*, 521 F.Supp. at 1131 (emphasis added; citations & footnote omitted). Concerning an earlier Indian allotment bill, Senator Teller remarked:

This is a bill that, in my judgment, ought to be entitled "A bill to despoil the Indians of these lands and to make them vagabonds on

the face of the earth," because in my view, that is the result of this kind of legislation.
11 Cong.Rec. 934 (Jan. 20, 1881) (remarks of Sen. Teller).

Ironically, By relying on its own limiting assumptions concerning congressional purpose, the *Hagen* majority reads the 1905 Act as providing in effect that "so much of said lands *as will be under the provisions of said acts restored to the public domain* shall be open to settlement and entry" under the homestead and townsite laws—precisely the language of the House bill rejected by Congress in 1905 in favor of the Senate version, which deliberately omitted the public domain language. *See* 114 S.Ct. at 979–980 (Blackmun, J., dissenting); *see also Ute Indian Tribe*, 521 F.Supp. at 1127–1132 & nn. 168–173A.

Nevertheless, having once determined that the 1905 Act did not alter the effect of the restoration language found in the 1902 Act and that the 1902 Act—not the 1905 Act—operated to diminish the Reservation, it seems doubtful at best that the *Hagen* majority would turn to the 1905 Act rather than the 1902 Act to define the territorial extent of that same diminishment. The specific tracts which were in fact entered and "settled" under the 1905 Act would thus be subsumed within the broader congressional directive that "all the unallotted lands within said reservation shall be restored to the public domain." Act of May 27, 1902, ch. 888, 32 Stat. 263.

ment." *Id.* (citing *Solem,* 465 U.S. at 470, 472, 104 S.Ct. at 1166, 1167) *Hagen* quotes *South Dakota v. Bourland,* 508 U.S. 679, 687, 113 S.Ct. 2309, 2316, 124 L.Ed.2d 606 (1993), which in turn quotes *County of Yakima v. Confederated Tribes and Bands of the Yakima Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), for the broader proposition that " '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' " 502 U.S. at 269, 112 S.Ct. at 693 (quoting *Montana v. Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985)).

When contrasted with the Court's disposition of substantive issues affecting Indians in its more recent cases, however, it remains unclear how much substantive impact these lofty expressions really have.[36] Indeed, the new interpretive "canon" articulated in *Hagen, viz.,* that legislation affecting Indian reservations should not be construed in such a fashion as "would seriously disrupt the justifiable expectations of the [non-Indian] people living in the area," 510 U.S. at 421, 114 S.Ct. at 970,[37] seems to rewrite the traditional principle that " 'doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent upon its protection and good faith," [38] so as to give greater deference to the Tribe's more numerous non-Indian neighbors than to the Indians themselves.[39] *See*

**36.** Of course, reliance on "canons of construction" as presaging a particular substantive result always proves to be somewhat problematic. *See, e.g.,* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes Are to Be Construed,* 3 Vand.L.Rev. 395 (1950) ("Plainly, to make any canon take hold in a particular instance, the construction contended for must be sold, essentially by means other than the use of the canon. . . ."). The canons themselves may simply represent shorthand expressions of more fundamental values, policies and perceptions as to institutional role. *See, e.g.,* William N. Eskridge, Jr. & Philip P. Frickey, *Foreword: Law as Equilibrium,* 108 Harv.L.Rev. 26 (1994), *and generally* Horace E. Read, John W. McDonald, Jefferson B. Fordham & William J. Pierce, Materials on Legislation 744–948 (4th ed. 1982).

**37.** Using a *"Cf."* signal, the majority opinion cites only to *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 604–605, 97 S.Ct. 1361, 1372, 51 L.Ed.2d 660 (1977), as authority supporting this interpretive principle. The *"Cf."* signal denotes that the cited authority *"supports a proposition different from the main proposition but sufficiently analogous to lend support."* Harvard Law Review Association, et al., The Bluebook: A Uniform System of Citation 23 (15th ed. 1991) (emphasis in original). The referenced pages of the *Rosebud* opinion point to "the unquestioned actual assumption of state jurisdiction over the unallotted lands . . . since the passage of the 1904 Act" (430 U.S. at 603) as evidence corroborating a finding of reservation diminishment:

> The long-standing assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and in land use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges.

430 U.S. at 604–05, 97 S.Ct. at 1372 (footnote omitted). *Rosebud* itself does not identify *whose* "justifiable expectations" are referenced.

*Hagen* further observes that "[w]e have recognized that '[w]hen an area is predominantly populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains Indian country seriously burdens the administration of state and local governments.' " 510 U.S. at 420–21, 114 S.Ct. at 970 (quoting *Solem,* 465 U.S. at 471–472 n. 12, 104 S.Ct. at 1166–67 n. 12). Of course, the burdens on federal and tribal agencies of administering "jurisdiction dependent on the tract book" following a finding of diminishment—most recently typified by the issues pending in this proceeding—have also been acknowledged. *See, e.g., Solem,* 465 U.S. at 472 n. 12, 104 S.Ct. at 1167 n. 12 ("Conversely, problems of an imbalanced checkerboard jurisdiction arise if a largely Indian opened area is found to be outside Indian country. See *Seymour v. Superintendent,* 368 U.S., at 358[, 82 S.Ct., at 428]"); *DeCoteau v. District County Court,* 420 U.S. 425, 466–67, 95 S.Ct. 1082, 1103, 43 L.Ed.2d 300 (1975) (Douglas, J., dissenting).

**38.** *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977) (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930)).

**39.** *See also* William N. Eskridge, Jr. & Philip P. Frickey, *Foreword: Law as Equilibrium,* 108 Harv.L.Rev. at 62 & n. 159 ("As statutes evolve, the text loses some of its focal power, and other considerations become increasingly important in statutory interpretation—the purpose of the law, the surrounding legal terrain, and statutory precedents. The 1993 Term [of the Supreme Court] was replete with cases invoking these evolutive considerations." (footnotes omitted) (citing "Hagen v. Utah, [510 U.S. 399, 414–21,] 114 S.Ct. 958, 967–70[, 127 L.Ed.2d 252] (1994)

*also* Lauren N. Soll, *The Only Good Indian Reservation is a Diminished Reservation? The New and Diluted Canons of Construction in Indian Law,* 41 FED.B.NEWS & J. 544 (1994); Robert Laurence, *the Unseemly Nature of Reservation Diminishment by Judicial, as Opposed to Legislative, Fiat and the Ironic Role of the Indian Civil Rights Act in Limiting Both,* 71 N.D.L.REV. 393 (1995).

■ Putting aside the metaphysics of interpretive canons, *Hagen,* particularly when read in tandem with *Perank,* leads to the conclusion that when speaking of "diminishment" under the 1902–1905 Acts, the Court was referring to the restoration of *all unallotted and unreserved lands* to the public domain. Consequently, it seems doubtful that a majority of the United States Supreme Court would adopt the narrower construction of the 1902 and 1905 Acts now urged by the Government and the Tribe, limiting the 1905 "diminishment" in the first instance to only those fee lands "actually settled" in the manner prescribed in the 1905 Act.[40] *See generally,* Robert Laurence, *su-*

*pra;* Ralph W. Johnson & Berrie Martinis, *Chief Justice Rehnquist and the Indian Cases,* 16 PUB.LAND L.REV. 1 (1995); James Grijalva, et al., *Diminishment of Indian Reservations: Legislative or Judicial Fiat?* (Panel Discussion), 71 N.D.L.REV. 415 (1995); Alex Tallchief Skibine, *Removing Race Sensitive Issues from the Political Forum or Using the Judiciary to Implicitly Take Someone's Country,* 20 J.CONTEMP.L. 1 (1994).

*Hagen,* though on its facts only deciding the "Indian country" status of Myton, Utah, effectively determined that the Uintah Reservation was diminished to the extent of the unallotted and unreserved lands that were opened to entry in 1905. To the extent that those lands were not later restored to tribal ownership and jurisdiction by subsequent congressional and administrative action, they ceased to have reservation status in 1905 and are no longer found within "Indian country" within the meaning of 18 U.S.C.A. § 1151 (1984).[41] To that extent, *Hagen* stands in

(O'Connor, J.) (subsequent legislative signals and private interpretation); ...").

Though largely taking *Hagen* and the *Hagen–Perank* criticism of *Ute Indian Tribe* at face value, Wendy L. Slater, *"Pulling up the Nails from the Uintah Indian Reservation Boundary:* Hagen v. Utah, 28 CREIGHTON L.REV. 529 (1995), criticizes *Hagen's* use of current demographics: "In its reliance on a demographic profile of the Reservation ninety years after its opening, the Court weakened its position, tainting its otherwise credible and well-supported analysis.... The Court should not have weighed the merits of retaining the Reservation by examining modern circumstances, but instead should have considered only the practical consequences which reflected congressional intent at the time the Reservation was opened for settlement. In simple terms, the power to discontinue reservation status lies with Congress and not with the Court." *Id.* at 555–56 (footnotes omitted).

**40.** Noting that Roosevelt City "was not settled under the townsite provisions of the 1905 Presidential Proclamation," the Tribe asserts that "[o]nly if it is determined that the City was settled on former homesteaded lands, a determination which cannot be made absent a title search, would the State have jurisdiction within Roosevelt City." Brief of Ute Indian Tribe at 22 n. 23. At the same time, the Tribe acknowledges that the status of Roosevelt was of some "concern to the Supreme Court in *Hagen, see* [510 U.S. at 420–21,] 114 S.Ct. at 970." *Id.* Under this court's reading of *Hagen,* the more pertinent

question is whether Roosevelt City is found within the unallotted and unreserved lands "opened" to entry and settlement in 1905. If so, absent some subsequent legislative or administrative act returning all or part of its lands to the Reservation, Roosevelt City lies outside of "Indian country" under 18 U.S.C. § 1151(a).

In the "Brief of Defendant Roosevelt City in Support of Defendant's Motion to Vacate and Set–Aside Preliminary Injunction and to Dismiss Plaintiff's Motion for Permanent Injunctive Relief," filed July 26, 1994, counsel offers what may best be characterized as an informal, generalized proffer of evidence bearing upon land tenure in Roosevelt based upon unidentified land record documents showing Roosevelt to be built entirely on "opened" unallotted lands. *Id.* at 3. Beyond that, other than expressing Roosevelt City's obvious impatience with not having the immediate, unfettered power to do as it pleases, its Brief sheds little additional light on the legal issues now before the court in this proceeding.

**41.** As the Tenth Circuit recently noted, " '[F]ederal courts "are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when ... [the dicta] is of recent vintage and not enfeebled by any [later] statement." ' " *Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1540 n. 10 (10th Cir.1995) (quoting *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 557 (8th Cir.1993) (brackets in original), *cert. denied,* — U.S. —, 114 S.Ct. 2741, 129

direct conflict with the Tenth Circuit's *en banc* ruling in *Ute Indian Tribe*, which held that all lands within the original exterior boundary of the Uintah Reservation remain within "Indian country" under the statute. At the same time, the Uintah Reservation, as an entity, continued to exist after 1905 as to allotted and reserved lands not "opened" and as to lands later restored to the reservation by Congress or the Department of the Interior, the return of which "would enlarge the boundaries of the reservation." *Perank,* 858 P.2d at 950 (citing *Solem,* 465 U.S. at 467–468, 104 S.Ct. at 1164). Thus, "Notwithstanding the diminishment of the Uintah reservation in *Hagen,* there was no question but that the land within the diminished reservation retained its status as Indian country." *Chickasaw Nation v. State ex re. Oklahoma Tax Comm'n,* 31 F.3d at 976 n. 8.

## Categories of Non–Trust Lands Now in Dispute

The three categories of non-trust, or fee lands identified in Paragraph 5.C of the Pretrial Order involve tracts that either were never located within the area of "opened lands" diminishment under *Hagen* or are tracts of "opened lands" which at some point were returned to tribal ownership, trust, and/or reservation status by congressional or administrative action. *See* Pretrial Order at 5 & n. 1.

### (a) Indian Allotments No Longer Held in Trust

■ "Lands allotted to individual Indians that have passed into fee status after 1905"

were never part of the "opened lands" and therefore were not affected by the restoration of unallotted lands to the public domain under the 1902 Act. Had Congress explicitly terminated the Uintah Reservation as a whole, leaving only individual Indian allotments, 18 U.S.C. § 1151(a) would not apply and the result may well be different, as it was in *DeCoteau* or *Yazzie.*[42] "Indian country" under § 1151(c) consists of individual Indian allotments, but only those allotments, "the Indian titles to which have not been extinguished." Were there no existing Uintah and Ouray Reservation as such, the State and Local Defendants' argument that trust status is determinative would be more persuasive. But where "all parties agree that the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use," (*Perank,* 858 P.2d at 934), § 1151(a) still finds application and the more limited language of § 1151(c) does not control.

Application of § 1151(a) to areas of the Reservation encompassing former Indian allotments also serves to lessen the burden on governmental and law enforcement agencies of determining "jurisdiction dependent on the tract book." *DeCoteau,* 420 U.S. at 466–67, 95 S.Ct. at 1103–04 (Douglas, J., dissenting). When located within a defined reservation boundary, jurisdiction remains constant even though trust status or ownership of a specific tract may change over time. *See Yazzie,* 909 F.2d at 1422 ("Although subsection 1151(a) clarifies that checkerboard *titles* within an

---

L.Ed.2d 861 (1994) (quoting *McCoy v. Massachusetts Inst. of Tech.,* 950 F.2d 13, 19 (1st Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992))).

**42.** In their arguments, counsel for the State and Local Defendants refer to one passage from this court's initial memorandum opinion discussing the effect of the 1902 Act, considered by itself:

Without much question, opening of the original terms of the 1902 Act would have accomplished the termination of the reservation; the unallotted lands were to be "restored to the public domain"—language precisely suited to disestablishment under *Seymour v. Superintendent* ... and *Mattz v. Arnett,* ....

521 F.Supp. at 1122 (footnote & citations omitted). Had Congress spoken but once, and had

all of the unallotted lands been "restored to the public domain" under the 1902 Act, this case would more closely resemble *DeCoteau,* where "the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs," and the reservation itself was terminated. 420 U.S. at 446, 95 S.Ct. at 1094. But as Justice Stewart took pains to point out in *Perank,* not all of the unallotted lands were so restored; the Uintah Reservation has always consisted of more than the mere "retention of allotments," starting with the 250,000–acres of grazing lands reserved for tribal use under the Joint Resolution of June 19, 1902 and the Acts of 1903 and 1905. 858 P.2d at 934 & n. 10. *See* "The Uintah Reservation: 'Diminished' or 'Terminated'?" *supra.*

existing reservation do not affect the status of an Indian reservation as reservation, subsections 1151(b) and (c) allow checkerboard *jurisdiction* outside reservation boundaries." (Emphasis in original; footnote omitted)). At the September 12, 1994 hearing, the court discussed this concept with counsel for the State of Utah:

THE COURT: You tell me that you acknowledge, at this point, that the State of Utah has no jurisdiction over what you characterize as trust lands?

Mr. ANDREWS: With very limited exceptions....

....

THE COURT: And you acknowledge, at least [as] to that area, the existence of a peripheral boundary of some kind?

MR. ANDREWS: At this point there is a legal description as to what are trust lands and what are not.

THE COURT: Now, just as a matter of curiosity, and this is strictly hypothetical; say I am a tribal member with an allotment and I am right on the border. And ... I convey out to a non-Tribe member. Do we thus, through private act, diminish the boundaries?

MR. ANDREWS: I believe that the act of conveying out an interior portion—

....

At this point, the state's position would be that in fact the conveyance out of some interior portion of some block would in fact be a reduction of the lands.

THE COURT: A diminishment?

MR. ANDREWS: In other words, it would not be Indian country.

THE COURT: And without any legislative action on the part of anybody?

MR. ANDREWS: That would be correct. I would point out that the issue of that circumstance has in fact been dealt with in the Yazzie case.

Transcript of Hearing, dated September 12, 1994, at 56:14–57:24.

Indeed, the *Yazzie* case was remanded "for consideration of whether some or all of P & M's South McKinley Mine is within Indian country under 18 U.S.C. §§ 1151(b) or (c)."

909 F.2d at 1422. On remand, it was determined that 48 Navajo trust allotments on 7,347 acres represent 47% of the surface area where the mine is located, with tribal and federal ownership representing 7% and 5% of the mine area, respectively. *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1534, 1542 (10th Cir.1995). The subsurface estate underlying the mine area is owned 52% by the United States and 47% by the successor in interest to the Santa Fe Pacific Railroad. *Id.* Rejecting Pittsburg & Midway's argument that its coal mine is not located within "Indian country" under § 1151(c) "because neither the Navajo Nation nor any individual Navajo allottee holds title to any of the subsurface coal estate," the Tenth Circuit expressed strong disapproval of measuring jurisdiction according to changes in ownership:

If we were to accept P & M's argument, jurisdiction would depend on commercial transactions between the United States, New Mexico, the Navajo Nation, and various private parties. *A particular parcel of land, or even an individual stick in the bundle of property rights, could suddenly change jurisdiction as a result of a single commercial transaction. This is an untenable prospect.* Such a result would unnecessarily complicate already convoluted jurisdictional questions throughout the West. *See generally* Paul W. Gates, *History of Public Land Law Development* (1968).

We hold that the 48 trust allotments comprising 47% of the surface area of the South McKinley mine site are Indian country by definition under 18 U.S.C. § 1151(c)....

52 F.3d at 1542 (emphasis added). Even in an allotments-only setting governed by § 1151(c), altering the jurisdictional landscape by private conveyance is viewed with disfavor in this Circuit.

Recognizing that the Uintah Reservation continued to exist as a reservation after 1905, as was acknowledged in *Perank,* and that *Hagen* "redefined the Reservation boundaries resulting from our earlier decision" in *Ute Indian Tribe,* as most recently observed by the Tenth Circuit in *Cuch,* the Reserva-

tion continues to embrace those lands never "opened" as well as lands once opened but later "restored to tribal jurisdiction" (*Perank*), and thus embraced within its "limits" under 18 U.S.C. § 1151(a), regardless of transitory shifts in ownership.

■ More analogous to this case than *DeCoteau* or *Yazzie,* the diminishment of the Rosebud Reservation again proves instructive. In *Beardslee v. United States,* 541 F.2d 705 (8th Cir.1976), the defendant argued that the federal district court lacked jurisdiction over his offenses occurring "in a house on land then owned by non-Indians" located in Mission, South Dakota, within Todd County and the Rosebud Reservation. "The original patent had been issued to an Indian allottee, but the Indian title was extinguished by conveyance to non-Indians in 1959." 541 F.2d at 706–707. Relying on *DeCoteau,* the defendant argued that the fee patented land in question was no longer "Indian country":

> The Indian conduct in *DeCoteau* did occur on non-Indian, unallotted land within the 1867 reservation boundaries.... However, the Supreme Court *also* concluded that as to this particular land, reservation status had been terminated by the Congressional Act of March 3, 1891, ... Appellant cites no statute similarly disestablishing the reservation status of Todd County in the Rosebud Reservation.
>
> Ownership of the land alone by a non-Indian is not sufficient to change reservation status....

*Id.* at 707 (emphasis in original; citations omitted). In the context of a *diminished* reservation, " 'Disestablishment thus is not effected by an allotment to an Indian or by conveyance of the Indian title to a non-Indian.' " *Id.* (quoting *Beardslee v. United States,* 387 F.2d 280, 286 (8th Cir.1967)).[43] Where the Reservation's "limits" persist, even though reduced or "redefined," § 1151(a) remains pertinent. Jurisdiction under § 1151(a) is allocated as a function of a defined, stable, and knowable *where* rather than merely a reflection of the vicissitudes of *who owns what* and *when.*

### (b) Lands Distributed to Mixed–Blood Utes Under the Ute Partition Act

■ Tribally owned lands divided and distributed under the Ute Partition Act, Act of August 27, 1954, ch. 1009, 68 Stat. 868, *codified at* 25 U.S.C.A. §§ 677–677aa (1983), likewise do not appear to fall within the 1905 "opened lands" diminishment under *Hagen.* The State and Local Defendants contend that because "fee lands distributed to former tribal members under the Ute Partition Act" are "not 'within the limits' of a reservation, the exterior boundaries having been diminished, they do not fit within any subdivision of 18 U.S.C. § 1151, and cannot be considered 'Indian country' for jurisdictional purposes." Defendants' Memorandum at 22. Yet it appears those lands were considered "Indian country" *before* they were distributed under the Act, and as tribal lands held in trust, even the defendants would concede that point. These were not Indian allotments, "the Indian titles to which have not been extinguished" (§ 1151(c)); absent a finding of "dependent Indian community" status under § 1151(b), the lands must have fallen within § 1151(a)—lands which are in Indian country because they are "land *within the limits of any Indian reservation.*" 18 U.S.C.A. § 1151 (1984) (emphasis added).

■ For purposes of § 1151(a), "Indian tribal trust lands" are not a category of Indian country distinct from "land within the limits of any Indian reservation." In *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), the Supreme Court expressly rejected a state-asserted distinction between "tribal trust land" and "reservation" status:

> Oklahoma argues that the tribal convenience store should be held subject to state tax laws because it does not operate on a formally designated "reservation," but on land held in trust for the Potawatomis. Neither *Mescalero* [*Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) ] nor any other precedent of this

**43.** As noted above, nothing in *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), or later cases disputes the *Beardslee* analysis affirming the continued reservation status of Todd County. *See* footnote 29 *supra.*

Court has ever drawn the distinction between tribal trust lands and reservations that Oklahoma urges. In *United States v. John*, 437 U.S. 634[, 98 S.Ct. 2541, 57 L.Ed.2d 489] (1978), we stated that the test for determining whether land is Indian country does not turn on whether that land is denominated "trust land" or "reservation." Rather, we ask whether the area has been " 'validly set apart for the use of the Indians as such, under the superintendence of the Government.' " *Id.* at 648–649, [98 S.Ct. at 2548–49]; see also *United States v. McGowan*, 302 U.S. 535, 539[, 58 S.Ct. 286, 288, 82 L.Ed. 410] (1938).

... Here, ... the property in question is held by the Federal Government in trust for the benefit of the Potawatomis. As in *John, we find that this trust land is "validly set apart" and thus qualifies as a reservation* for tribal immunity purposes. 437 U.S. at 649[, 98 S.Ct. at 2549].

498 U.S. at 511, 111 S.Ct. at 910 (emphasis added). The Court reiterated this point in *Oklahoma Tax Commission v. Sac and Fox Nation*, 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993):

The Commission ... contends that the relevant boundary for taxing jurisdiction is the perimeter of a formal reservation, not merely land set aside for a tribe or its members.... Here, ... some of the Tribe's members may not live within a reservation; indeed, if the Commission's interpretation of the 1891 Treaty is correct and the Reservation was disestablished, none do.

... We noted [in *Potawatomi* ] that we have never drawn the distinction Oklahoma urged. Instead, we ask only whether the land is Indian country.... Accord, F. Cohen, Handbook of Federal Indian Law 34 (1982 ed.) ("[T]he intent of Congress, as elucidated by [Supreme Court] decisions, was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments."); *Ahboah v. Housing Authority of Kiowa Tribe of Indians,* 660 P.2d 625, 629 (Okla.1983) (same).

. . . .

Absent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities....

508 U.S. at 124–25, 128, 113 S.Ct. at 1991–92, 1993.

As Justice Marshall noted in *Solem,* "Congress uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians within reservation boundaries" in § 1151(a). *Solem,* 465 U.S. at 468, 104 S.Ct. at 1164. On this point, the State and Local Defendants' " 'Indian country'-equals-trust lands" equation collides with the express language of the statute. In arguing that "after diminishment, when lands *leave* trust status, they no longer fit within any category of 18 U.S.C. § 1151, and so are no longer Indian Country," (Defendants' Memorandum at 20), the defendants seek to *recouple* reservation status and tribal trust status—in effect writing the "notwithstanding issuance of any patent" language entirely out of § 1151(a).

All of the case law cited in support of the defendants' "trust lands only" theory of Indian country concerns the status of Indian allotments remaining in disestablished areas of a reservation. *See United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914) (allotted lands remain "validly set apart for the use of the Indians" where they were excepted from restoration of portion of reservation to the A.O. public domain); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 615–616 n. 48, 97 S.Ct. 1361, 1377–78 n. 48, 51 L.Ed.2d 660 (1977) (Indian allotments outside diminished reservation remain "Indian country"); *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (reservation terminated; only Indian allotments remain); *Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387 (10th Cir.1990) (same). They cite no case holding that "Indian tribal trust lands" no longer fall within § 1151(a) when they

"leave trust status," presumably through issuance of a patent.

At one time, "Indian country" status was held to be dependent upon Indian title, and that land ceased to be Indian country "[as] soon as they parted with the title ... without any further act of Congress, ..." *Bates v. Clark,* 95 U.S. 204, 208, 24 L.Ed. 471 (1877). *See United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909) (Indian country and reservation status not synonymous). Congress deliberately abandoned the title-dependent definition of Indian country by enacting 18 U.S.C. § 1151(a) in 1948. *See* FELIX S. COHEN, FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 29–38 (Rennard Strickland, ed. 1982). This court has found no authority suggesting that the title-dependent *Bates v. Clark* definition of "Indian country" persists as a rule of federal law despite the enactment of § 1151(a). *See also Ute Indian Tribe,* 521 F.Supp. at 1081–1084.

■ "Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States. *See* 18 U.S.C. § 1151." *Sac and Fox,* 508 U.S. at 123, 113 S.Ct. at 1990. Once land has been " 'validly set apart for the use of the Indians as such, under the superintendence of the Government,' " [44] it becomes "land within the limits of any Indian reservation" under § 1151(a). Having once been "validly set apart" as Reservation land, "all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909); *accord, Indian*

*Country, U.S.A.,* 829 F.2d at 973–976. As noted above, land within such limits remains Indian country "notwithstanding the issuance of any patent," *i.e.,* any change in title or ownership. 18 U.S.C. § 1151(a). The same would appear to be true of tribal lands distributed in fee to individual Mixed–Blood Utes under the Ute Partition Act.

■ It therefore seems that the more pertinent question in this case is whether the Ute Partition Act worked its own separate diminishment of the Reservation as to those lands conveyed to the Mixed–Blood Utes. The Tribe represents that approximately 211,430 acres of tribal land were distributed to the Mixed–Blood Utes pursuant to the Ute Partition Act, and that since 1954, the Tribe has reacquired and placed into trust status approximately 179,000 acres of lands distributed under the Act. Brief of Ute Indian Tribe at 16 & n. 21. As to the latter acreage, of course, it remains uncontroverted that it comprises part of the Reservation and is located within "Indian country" under 18 U.S.C. § 1151. Thus, based upon the Tribe's figures, approximately 32,430 acres of land distributed under the Ute Partition Act remain in non-trust, or fee status.[45]

In *Hackford v. Babbitt,* 14 F.3d 1457 (10th Cir.1994), the Tenth Circuit dealt with continuing Indian water rights appurtenant to lands distributed under the Ute Partition Act and currently owned by a Mixed–Blood Ute individual. Plaintiff Calvin C. Hackford, a terminated Mixed–Blood Ute belonging to the Uintah Band, "owns seven parcels of land *within the Uintah and Ouray Indian Reservation* in Utah." 14 F.3d at 1459 (emphasis added).[46] Some of those parcels are served by the Uintah Irrigation Project, which is

---

**44.** *United States v. John,* 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978) (quoting *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914)).

**45.** In the Memorandum from the Regional Solicitor, U.S. Dept. of the Interior to the Superintendent, Uintah and Ouray Agency, dated July 7, 1994, at 11–12, the Government reports that 26,763.34 acres were sold into fee status pursuant to 25 U.S.C.A. § 677h, and indicates that under 25 U.S.C.A. § 677l, fee patents were issued for 2,733.569 acres of former allotments,

29,030.969 acres of tribal agricultural lands, and 16,190.61 acres of grazing lands.

**46.** However, *Hackford* was decided on January 21, 1994, approximately one month *before* the United States Supreme Court announced its decision in the *Hagen* case. While *Hagen* likely will have no practical impact on the management of Ute water rights under the Ute Partition Act, the language of the *Hackford* opinion quoted above cannot strictly be viewed as controlling on the question whether lands distributed to the Mixed–Blood Utes remain within Reservation boundaries following *Hagen.*

managed by the United States Department of the Interior. *Id.* The Tenth Circuit held that under the provisions of the Ute Partition Act, Hackford retained water rights sharing the same priority date as water rights appurtenant to other reservation lands, *viz.,* no later than the creation of the reservation in 1861, consistent with *Winters v. United States,* 207 U.S. 564, 577, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). *Id.* at 1467–69.

The court has reviewed the Ute Partition Act and finds nothing dealing with the question of reservation boundaries, at least in express terms. However, the Act does contain language that bears upon some jurisdictional questions: Section 16 of the Act, 25 U.S.C.A. § 677*o*, provides that "[w]hen any mixed-blood member of the tribe has received his distributive share of the tribal assets distributed to the mixed-blood group under the provisions of section 677i," the Secretary of the Interior "is authorized and directed to immediately transfer to him unrestricted control of all other property held in trust for such mixed-blood member by the United States," as well as "remov[ing] all restrictions on the sale or encumbrance of trust or restricted property owned by such member of the tribe, and Federal supervision of such member and his property shall thereby be terminated," with the exception of any interest in unadjudicated or unliquidated tribal claims, rights or assets which remain in trust under the Act. *See generally* 25 C.F.R. § 217.1 *et seq.* (1995). Section 17 of the Act, 25 U.S.C.A. § 677p, provides that "[a]fter seven years from August 27, 1954, all property distributed to the mixed-blood members of the tribe . . . and all income derived therefrom . . . shall be subject to the same taxes, State and Federal, as in the case of non-Indians; . . .," excepting income of corporations organized to jointly manage unliquidated and undistributed tribal assets. Section 18 of the Act, 25 U.S.C.A. § 677q, similarly provides that after federal supervision of Mixed–Blood Ute property is terminated, "the laws [with respect to the probate of wills, determination of heirship, and the administration of estates] of the several States, Territories, possessions and the District of Columbia within which such mixedblood members reside at the time of their death shall apply." Section 23 of the Act, 25 U.S.C. § 677v, provides that following removal of trust restrictions on the property of Mixed–Blood Ute members, "All statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to such member over which supervision has been terminated, and the laws of the several States shall apply to such member in the same manner as they apply to other citizens within their jurisdiction."

The jurisdictional provisions of the Ute Partition Act operate to render those tribal members over whom federal supervision was terminated virtually indistinguishable from their non-Indian neighbors. The individual property of the Mixed–Blood Utes, together with land distributed to them under the Act, was removed from trust status and federal supervision, and in essence, conveyed to them in fee. With few qualifications, their lands became subject to taxation, probate administration, and alienation under State law just as if they were fee lands owned by non-Indians. Individual Mixed–Blood Utes became subject to state laws "in the same manner as they apply to other citizens within their jurisdiction," *i.e.,* as though the Mixed–Blood Utes were non-Indians.

Yet the effects of the Ute Partition Act, though drastic, were not absolute. For example, Section 21 of the Act, 25 U.S.C.A. § 677t, expressly states that "[n]othing in this subchapter shall abrogate any water rights of the tribe or its members." As explained in *Hackford,* "water rights were treated as appurtenant to the lands that were divided between the groups" under the Act; irrigable lands such as those owned by Mr. Hackford retained a right of user to water reserved for the Ute Indian Tribe under the *Winters* doctrine when the Reservation was created in 1861. 14 F.3d at 1463, 1468–69. Although "the individuals with irrigable land may have a right of user to the water," *Hackford* points out that "the water right itself is a tribal right." 14 F.3d at 1468.

When the United States set aside and reserved land for the Indians, it also impliedly reserved sufficient water to accomplish the purposes for which the reserva-

tion was established. *Winters,* 207 U.S. at 577, 28 S.Ct. at 212.... When the reservation land was allotted, and the Project developed, the allottees·acquired the right to use a portion of the tribe's reserved water right with a priority date no later than the creation of the reservation. *United States v. Powers,* 305 U.S. 527, 532–33, 59 S.Ct. 344, 346, 83 L.Ed. 330 (1939). Therefore, Hackford's right of user, whether derived from the Uintah Band or the Ute tribe, has the same priority date as that delivered through the Project to allotted lands.

14 F.3d at 1469. *Hackford* further concluded that "[u]nder the Partition Act the Secretary's authority to manage the [Uintah Indian Irrigation] Project and assess charges was unaffected." *Id.* at 1468. "Likewise the Partition Act did not change the trust relationship set up by the 1906 Act." *Id. Hackford* holds that for purposes of management of the Uintah Indian Irrigation Project and the Ute tribal reserved water rights upon which it is based, the non-trust lands of a Mixed–Blood Ute distributee under the Ute Partition Act are treated in a manner indistinguishable from Indian trust lands served by the Project. A finding that the lands distributed to Mixed–Blood Utes under the Act remain a part of the Uintah Reservation seems wholly consistent with the continuing use of the Tribe's reserved water rights pursuant to *Winters* and its progeny to irrigate the distributed lands.

Similarly, this court previously held that the Ute Partition Act did not divest individual Mixed–Blood Utes of their personal rights of user in hunting and fishing rights belonging to the Ute Indian Tribe, or limit the exercise of those rights to the lands distributed to Mixed–Blood Utes under that Act. *United States v. Felter,* 546 F.Supp. 1002 (D.Utah 1982), *affirmed,* 752 F.2d 1505 (10th Cir.1985). *Felter* holds that the tribal hunt-

ing and fishing rights represent another example of "other assets not susceptible to equitable and practical distribution," 25 U.S.C. § 677i, which remain in trust under joint management of the Tribe and the Mixed–Blood Utes, and makes no distinction between lands distributed to the Mixed–Blood Utes and lands retained in tribal ownership.

Citing to *Felter* and to § 23 of the Ute Partition Act, 25 U.S.C. § 677v, the State and Local Defendants argue that "[t]here is another compelling reason for not considering former UPA lands as 'Indian Country' for jurisdictional purposes.... § 23 of the UPA provided that ... all statutes affecting Indians because of their status as Indians would no longer be applicable to mixed-bloods, and state law would henceforth be applied." State and Local Defendants' Memorandum at 22 n. 16. "In short," defendants assert, "state law applies to mixed-bloods and their lands as with any other citizen of the State." *Id.*[47] Rejecting a similar argument that § 6 of the General Allotment Act, which provided that upon issuance of patents in fee to Indian allottees, "each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside ...,"[48] extended state jurisdiction over fee-patented allotments, the Supreme Court in *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), observed:

> If the General Allotment Act itself establishes Montana's jurisdiction as to those Indians living on "fee patented" lands, then for *all* jurisdictional purposes—civil and criminal—the Flathead Reservation has been substantially diminished in size....
>
> ... The State has referred us to no decisional authority—and we know of

---

47. Of course, *Felter* holds otherwise as to Indian hunting and fishing rights. *See* 546 F.Supp. at 1024 (Mixed–Blood Utes' right of user in tribal hunting and fishing rights "would remain subject to *tribal* regulation, whether on or off tribally or Indian owned lands. It would be subject at most to minimal state regulation. *See Kimball v. Callahan,* 590 F.2d [768], at 776–777 [ (9th Cir. 1979), *cert. denied,* 444 U.S. 826[, 100 S.Ct. 49,

62 L.Ed.2d 33]]" (Emphasis in original.)). *Accord, Menominee Tribe of Indians v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

48. Act of February 8, 1887, ch. 119, § 6, 24 Stat. 390, *codified as amended at* 25 U.S.C.A. § 349 (1983).

none—giving the meaning for which it contends to § 6 of the Allotment Act in the face of the many and complex intervening jurisdictional statutes directed at the reach of state law within reservation lands—statutes discussed, for example, in *McClanahan*, 411 U.S., at 173–79[, 93 S.Ct., at 1262–66].... Congress by its more modern legislation has evinced a clear intent to eschew any such "checkerboard" approach within an existing Indian reservation, and our cases have in turn followed Congress' lead in this area.

425 U.S. at 478, 479, 96 S.Ct. at 1643, 1644 (emphasis in original). Arguably, the distribution of tribal lands in fee to Mixed–Blood Ute distributee under the Ute Partition Act by itself can reduce the size of the Uintah Reservation "for *all* jurisdictional purposes" no more than § 6 of the General Allotment Act diminished the Flathead Reservation in *Moe*.

Conceding that § 23 of the Act is "not controlling on the issue of what lands fall within § 1151," the State and Local Defendants suggest that "the return of UPA lands to tribal jurisdiction cuts against the purposes of the UPA, and would be likely to engender additional disputes between the Tribe and the mixed-blood former members." Defendants' Memorandum at 22 n. 16. Remembering that under the Ute Partition Act "the mixed blood former members" became jurisdictionally indistinguishable from non-Indians in almost all respects, the same is true whether they are found within or outside of "Indian country" under § 1151(a). Blanket application of state law to the Mixed–Blood Utes is not so much a statement that they no longer reside within "Indian country" [49] as it is a statement that the Mixed–Blood Utes are no longer deemed to be "Indians" for purposes of federal law, including 18 U.S.C. §§ 1151 *et seq.* Except as to those matters which are retained in trust status or under federal, tribal, or joint tribal/mixed-blood management under the Act (*e.g.*, oil, gas, water, hunting and fishing rights, etc.), the Tribe could assert no greater jurisdiction over Mixed–Blood Ute individuals than it can over non-Indians located on fee lands within "Indian country," a result which hardly "cuts against the purposes of the UPA." Given that the Ute Partition Act expressly contemplates a continuing relationship between the Tribe and its former members as to undivided assets, the defendants' argument founders.

Adapting the "fairly clean analytical structure" established by the Supreme Court in *Hagen* and *Solem*, as well as the earlier decisions examined in detail in this court's initial memorandum opinion, (*see* 521 F.Supp. at 1085–1092), to the language, history, and circumstances surrounding the Ute Partition Act, this court finds nothing clearly evidencing a congressional intent to alter or further diminish the boundaries of the Uintah Reservation by distributing tribally-owned lands to the Mixed–Blood Utes, or "events surrounding the [Act's] passage ... [which] unequivocally reveal a widely held, contemporaneous understanding" that such was Congress' purpose. *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166. *Cf. Peabody Coal Co. v. Navajo Nation*, 75 F.3d 457, 464 (9th Cir.1996) (partition of tribal lands under Navajo–Hopi Land Settlement Act of 1974 not a reservation "diminishment"; Act divided Navajo–Hopi joint use area into two separate reservations). During the short-lived "termination era," Congress' attention was largely focused on other questions.[50] The "Indian country"

---

**49.** Following the enactment by Congress of the Ute Partition Act, Preston Allen, a Mixed–Blood Ute "residing on the Uintah Indian Reservation in Duchesne County, Utah," was denied the right to vote by Porter Merrell, Duchesne County Clerk, in a state-supervised election—a denial prompted by state statute and rationalized by the Utah Supreme Court based upon Allen's continued residence on *an existing Indian reservation*. *Allen v. Merrell*, 6 Utah 2d 32, 305 P.2d 490, 492–495 (1956), *vacated and remanded as moot*, 353 U.S. 932, 77 S.Ct. 809, 1 L.Ed.2d 756 (1957).

As to this issue, the State of Utah does not write on the cleanest of slates.

**50.** In 1953, Congress had created a wholly separate mechanism to extend state jurisdiction over Indian reservations, Public Law 83–280. *See* Act of August 15, 1953, ch. 505, 67 Stat. 588; Felix S. Cohen, Felix S. Cohen's Handbook of Federal Indian Law 175–77 (Rennard Strickland ed. 1982). If anything, Congress in 1954 was contemplating much more sweeping goals—the ultimate termination of entire tribes as well as their reservations—in order to bring an end to the perceived evils of federal supervision, and thus

status of the distributed lands thus did not change either upon distribution or upon the later reacquisition of many of the parcels by the Tribe; these lands remained within the "limits" of the Reservation under § 1151(a) at all pertinent times.

### (c) Lands Exchanged into Non–Trust or Fee Status

■ The third category of non-trust, or fee lands identified in Paragraph 5.C of the Pretrial Order is "lands that were held in trust after the Reservation was opened in 1905 but that since have been exchanged into fee status by the Tribe for then-fee (now trust) lands in an effort to consolidate its land holdings." Like the individual Indian allotments discussed above, the lands embraced by this latter category (at least as it is defined) were never part of the "opened lands" restored to the public domain under the 1902 Act.

Had Congress explicitly terminated the Uintah Reservation as a whole, 18 U.S.C. § 1151(a) would not apply and the result as to these "exchanged" fee lands may well be different. As with the Indian allotments, were there no existing Uintah and Ouray Reservation as such, the State and Local Defendants' argument that trust status is determinative might prevail. But where "all parties agree that the Uintah Reservation, as a political entity, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use," (*Perank*, 858 P.2d at 934), § 1151(a) still finds application.

The Indian Land Consolidation Act, Pub.L. No. 97–459, title II, 96 Stat. 2517 (1983), *codified at* 25 U.S.C.A. §§ 2201–2211 (Supp. 1995), appears primarily directed to exchanges of Indian tribal lands for individual Indian trust lands (*e.g.*, allotments) in an

effort to consolidate tribal land holdings. *See* 25 U.S.C.A. § 2203(a). 25 U.S.C.A. § 2204 states that "[a]ny Indian tribe may purchase at no less than the fair market value part or all of the interests in any tract of trust or restricted land *within that tribe's reservation or otherwise subject to that tribe's jurisdiction* with the consent of the owners . . . ." (Emphasis added.) The Act also includes provisions permitting restrictions on dissipation of individual Indian trust holdings through inheritance by non-Indians. *See* 25 U.S.C.A. §§ 2205–2206. The Indian Land Consolidation Act represents a House-conceived expansion of a Senate bill designed both to permit the consolidation of checkerboarded tribal landholdings within the opened Devil's Lake Sioux Reservation in North Dakota and to "reduce instances of fractionated heirship in trust lands and provide land for tribal programs designed to improve the economy of the tribe and its members . . . ." H.Rep. No. 97–908, 97th Cong., 2d Sess. 5 (reprinted in 1982 *U.S.Code Cong. & Admin.News* 4415, 4416).[51] The House amendment incorporated language of H.R. 5856, "an omnibus bill which makes provisions almost identical to [the Senate bill] applicable to all tribes." *Id.* at 9 (reprinted in 1982 *U.S.Code Cong. & Admin.News* at 4419). As the House Committee Report explains:

Many Indian tribes do not own all their lands in a single tract but have their tribal lands spread out in many tracts over a large geographical area where tracts of land are owned by the tribe, by individual Indians who hold their lands in trust or restricted fee and by non-Indians holding their lands in fee. This "checkerboard" pattern of land ownership makes it very hard for tribes to develop and adopt comprehensive and constructive land use plans.

would have given little or no thought to adjustment of reservation boundaries during the interim. *See generally,* H.R.Con.Res. 108, 83d Cong., 1st Sess., 67 Stat. B132 (1953); Felix S. Cohen's Handbook of Federal Indian Law 170–75; Donald L. Parman, Indians and the American West in the Twentieth Century 135–142 (1994); Charles Wilkinson & Eric Biggs, *The Evolution of the Termination Policy,* 5 Am. Indian L.Rev. 139 (1977).

**51.** S. 503, the original Senate version of the Indian Lands Consolidation Act, concerned the

Devil's Lake Sioux Reservation, a reservation where the unallotted lands were "opened" to non-Indian entry without diminishment or termination of the reservation's boundary. *See, e.g., United States v. Grey Bear,* 636 F.Supp. 1551 (D.N.D.1986), *affirmed in part, reversed in part on other grounds,* 828 F.2d 1286 (8th Cir.1987), *district court affirmed on en banc rehearing re: misjoinder issue,* 863 F.2d 572 (8th Cir.1988).

The amendment provides certain mechanisms by which the tribes will be able to consolidate their tribal landholdings by allowing the Secretary of the Interior to acquire certain lands for the tribes and allowing tribes to exchange and sell certain tribal lands.

*Id.* at 10 (reprinted in 1982 *U.S. Code Cong & Admin.News* at 4419). Thus, the Act is directed more toward consolidation and expansion of tribally owned lands for purposes of land use planning and economic development than the redrawing of jurisdictional boundaries.

As with Indian allotments, where such land exchanges take place within the existing boundaries of a reservation, the transition of a particular parcel into or out of tribal ownership or trust status has no impact on the existing jurisdictional limits. Under the Defendants' "trust-lands-only" analysis of "Indian country," the jurisdictional landscape would be altered each time an exchanged parcel changes trust status, further complicating any tribal land consolidation program.

As to each of the three categories of non-trust, or fee lands identified in Paragraph C of the Pretrial Order, *Hagen* and *Ute Indian Tribe* are not locked in irreconcilable conflict. Under both rulings, these lands remain within the "limits" of the Reservation for purposes of 18 U.S.C. § 1151(a) and are found within "Indian country" regardless of their particular ownership status, at least so long as they are not found among the unallotted and unreserved lands "opened" in 1905 and never subsequently restored to the Reservation by legislative or administrative act. It is only as to the latter category, the "opened" lands never restored to the Reservation, that *Hagen* and *Ute Indian Tribe* diverge.

As an attachment to the United States' Memorandum as *amicus curiae,* the Government submitted a preliminary draft "Uintah and Ouray Reservation Ownership Status Map" illustrating the land tenure and current status of various tracts located within the original Uintah Reservation boundaries. The exhibit uses contrasting colors to differentiate the various categories of land discussed above, based upon the Government's on-going compilation of land tenure data. *Orange,* for example, indicates current Ute tribal trust lands, while *medium blue* and *light blue* identify "opened" lands which were the subject of homestead or "cash entry," respectively. The disputed categories of non-trust, non-opened lands just discussed (former Indian allotments, etc.), together with existing Indian trust allotments, are aggregated within the map's *purple* regions.

Counsel has made it very clear that the exhibit does not represent the final word as to the land tenure of each tract depicted. Nonetheless, the exhibit does offer a fair approximation of what a tract map reflecting the effects of the 1902–1905 Acts as read in *Hagen* would look like, as modified to account for those lands subsequently restored to the Reservation by congressional or administrative action. Treated as an illustrative rather than a definitive work, the exhibit offers helpful guidance in identifying those lands within the original boundaries of the Uintah Reservation which are affected by the Supreme Court's *Hagen* decision.

### *Ute Indian Tribe, Hagen* and the Finality of Litigation

Having defined the point of divergence between *Hagen* and *Ute Indian Tribe,* the court turns to the next question presented: *which* ruling governs as to the parties to this action? Each party argues the merits—and asserts the obviousness—of its preferred answer to that query. Paragraphs 5.A and 5.B of the Pretrial Order frame the question of which ruling governs in these terms:

A. In spite of *Hagen,* are the State and Local Defendants precluded as a matter of law or equity under the doctrine of collateral estoppel or otherwise, from asserting jurisdiction over the Tribe or its members within the exterior boundaries of the Uintah and Ouray Reservation, as those boundaries were defined in *Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir.1985), *cert. den.* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986)?

B. Although the U.S. Supreme Court denied the Tribe leave to intervene as a party in *Hagen,* is the Supreme Court's decision binding on the Tribe and its mem-

bers in this action under the doctrine of *stare decisis* or otherwise?

Both of these questions raise important policy concerns involving the finality of a court's judgment in a litigated dispute and the need for uniformity of federal law throughout our judicial system as well as the supervisory power of both the Supreme Court and the courts of appeals.

### (a) *Ute Indian Tribe,* Res Judicata and Collateral Estoppel

Relying upon the relitigation exception to the Anti–Injunction Act, 28 U.S.C. § 2283 (1994), in seeking further injunctive relief in this proceeding, the Ute Indian Tribe asserts collateral estoppel to be the controlling principle. The Tribe contends that as a party to this litigation, "the State was precluded from relitigating the issue resolved in *Ute Indian Tribe,* including whether Congress intended to diminish the Uintah Valley Reservation when it was opened to non-Indian settlement in 1905, against the Tribe or anyone in privity with the Tribe," (Brief of Ute Indian Tribe at 8), citing *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In *Montana,* the Supreme Court explained the role of the doctrines of res judicata and collateral estoppel in the judicial process and the important policies underlying both:

> A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49[, 18 S.Ct. 18, 27, 42 L.Ed. 355] (1897).

440 U.S. at 153, 99 S.Ct. at 973. Under *res judicata,* "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action...." *Id.* (citations omitted). Under *collateral estoppel,* "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation...." *Id.* (citations omitted).

Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* at 49[, 18 S.Ct. at 27]; *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299[, 37 S.Ct. 506, 507, 61 L.Ed. 1148] (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

440 U.S. at 153–54, 99 S.Ct. at 973–74 (footnote omitted).

The State and Local Defendants respond that "[c]ollateral estoppel is a discretionary doctrine that has no application where there has been an intervening change in legal principles," (Defendants' Memorandum at 10), and that "[i]n light of the intervening substantive changes of law since *Ute Indian Tribe,* that decision's validity for collateral estoppel purposes is questionable at best." *Id.* at 23–24 (citing *Brock v. Williams Enterprises of Georgia,* 832 F.2d 567, 574 (11th Cir.1987), and *Kania v. Fordham,* 702 F.2d 475, 476 n. 2 (4th Cir.1983)). "The State and Local Defendants are therefore not bound by the Tenth Circuit's decision in *Ute Indian Tribe* where the logic of that decision has been undermined by *Hagen.*" (*Id.* at 10 (footnote omitted)).

Both the Utah Supreme Court in *Perank* and the United States Supreme Court in *Hagen* formally sidestepped the question of the collateral estoppel effect of the Tenth Circuit's *Ute Indian Tribe* decision, relying largely upon notions of waiver. In *Perank,* the court hastened to point out that "neither Perank, the Department of Justice, nor the Tribe suggests that the Tenth Circuit's *en banc* decision in *Ute Indian Tribe* has res judicata effect in this case." 858 P.2d at 931 (footnote omitted). In its brief as *amicus,* the Tribe discussed only defendant Perank's status as an Indian; it was silent on the collateral estoppel question. For its part,

the United States simply submitted a copy of the brief it had filed in opposition to the certiorari petition in *Ute Indian Tribe* six years earlier.

In *State of Utah v. Hagen,*[52] however, the Utah Court of Appeals had expressly relied on collateral estoppel in finding *Ute Indian Tribe* controlling on the boundary issue. Nevertheless, the Utah Supreme Court reversed, citing *Perank,* without further discussion of collateral estoppel.[53]

The United States Supreme Court also declined to address the collateral estoppel effect of *Ute Indian Tribe* in *Hagen* on procedural grounds: because counsel initially representing petitioner Hagen had "disavowed the collateral estoppel argument at the petition stage," the Court saw "no reason to consider an argument that petitioner not only failed to raise but on which he expressly refused to rely in seeking a writ of certiorari, ..." *Hagen,* 510 U.S. at 410, 114 S.Ct. at 965.[54]

**52.** 802 P.2d 745 (Utah Ct.App.1990) ("While we have not been acquainted with the precise arguments advanced by the state in *Perank,* we are hard-pressed to see how, given the Supremacy clause and the doctrine of collateral estoppel, our state courts could reach a contrary decision that would have any practical effect."), *reversed,* 858 P.2d 925 (Utah 1992).

**53.** In footnote 3 of the *Perank* opinion, Justice Stewart essayed further concerning the collateral estoppel issue which *Perank* did not decide:

Even if the defense had been raised in this case, its application against the State of Utah would be problematic. Although we have held that collateral estoppel does not require mutuality of parties when it is raised defensively against private litigants, ... we have not decided whether the doctrine of nonmutual collateral estoppel applies against the State. Federal law generally requires full mutuality of parties when collateral estoppel is applied against the government. *See United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *see also United States v. Stauffer Chemical Co.,* 464 U.S. 165, 169, 104 S.Ct. 575, 577, 78 L.Ed.2d 388 (1984); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 155–62, 99 S.Ct. 970, 974–78, 59 L.Ed.2d 210 (1979); *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). Nonmutual collateral estoppel does not apply against the government because of overriding policy considerations. *Mendoza,* 464 U.S. at 163–64, 104 S.Ct. at 574. The rule requiring full mutuality of parties has also been required with respect to estopping state governments. *See Hercules Carriers, Inc. v. Florida,* 768 F.2d 1558, 1577–82 (11th Cir. 1985). *See generally* Restatement (Second) of Judgments § 28 (1982); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4425 (1981 & Supp. 1992). As the Utah cases cited in footnote 2 indicate, the issue of reservation diminishment can arise in a number of civil contexts in which the State of Utah is not a party, and rather than delay a decision on an issue of such substantial public importance that will inevitably recur, we think it appropriate to

address the diminishment question, even if res judicata were otherwise applicable against the State.

858 P.2d at 931 n. 3 (citations omitted). In its Respondent's Brief submitted to the United States Supreme Court in *Hagen,* the State of Utah pointed to footnote 3 of *Perank* and argued that "[a]s applied to Perank, this discussion by the Utah Supreme Court is probably dictum. However, as applied to Hagen this language *is a direct and clear ruling.* The Utah Supreme Court determined it would not apply the doctrine of collateral estoppel to bar litigation of the Reservation diminishment issue for reasons of public policy ...," and that this ruling "applies equally to Hagen." Brief of Respondent, at 47, 1993 WL 384805 (emphasis added). That is one reading of footnote 3....

**54.** In *Hagen,* Justice O'Connor suggested that "[p]etitioner's only recourse would have been to attack the judgment in *Perank* on the ground that the Utah Supreme Court failed to give effect sua sponte to the prior determination in *Ute Indian Tribe* that the reservation had not been diminished." *Hagen,* 510 U.S. at 409, 114 S.Ct. at 964. Yet Hagen was not petitioning for review of the judgment in *Perank.* Rather, Hagen had *prevailed* before the Utah Court of Appeals on grounds including collateral estoppel:

The federal courts, construing federal statutes, federal regulations, and federal Indian policy, have determined that Myton is within the confines of the reservation. *See Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir.1985) (en banc), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986).... The Tenth Circuit's decision does not appear to hold open any role for the state courts in refining its holding in *Ute Indian Tribe.* While we have not been acquainted with the precise arguments advanced by the state in *Perank,* we are hard-pressed to see how, given the Supremacy clause and *the doctrine of collateral estoppel,* our state courts could reach a *contrary* decision that would have any practical effect.

*State of Utah v. Hagen,* 802 P.2d 745, 747 (Utah Ct.App.1990), *reversed,* 858 P.2d 925 (Utah 1992). Pushing the collateral estoppel issue aside, the Utah Supreme Court summarily reversed the

The Tribe recounts that after certiorari had been granted in *State of Utah v. Hagen*, it filed a motion to intervene as a petitioner in the proceedings before the United States Supreme Court. The motion received a luke-warm response from the State of Utah and ultimately was denied by the Court, relegating the Tribe once again to the role of an *amicus*. The Tribe now argues that as an *amicus*, it was not bound by the Court's ruling in *Hagen*, citing *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332–33 & n. 17, 99 S.Ct. 645, 652 & n. 17, 58 L.Ed.2d 552 (1979), and *Kerr–McGee Chemical Corp. v. Hartigan*, 816 F.2d 1177 (7th Cir.1987). According to the Tribe, "[t]he Supreme Court has ruled that a sovereign is not bound by a decision purporting to resolve a boundary dispute affecting that sovereign, when the sovereign was not a party to the proceedings," citing *Georgia v. South Carolina*, 497 U.S. 376, 110 S.Ct. 2903, 111 L.Ed.2d 309 (1990). Brief of Ute Indian Tribe at 11–12. Conversely, we may suppose, a sovereign *is* bound by a decision where that sovereign is a party to the proceedings.

The Tribe suggests that the consequences of the *Hagen* case, when considered in light of its procedural posture, are three-fold: (1) the Ute Indian Tribe is not directly bound by the United States Supreme Court's judgment in *Hagen* because the Tribe was never joined as a party to that proceeding; (2) the State of Utah is directly bound by the Tenth Circuit's *en banc* ruling in *Ute Indian Tribe v. State of Utah*, in which the State did participate as a party; and (3) the State of Utah may assert jurisdiction over non-Indians and non-member Indians within those portions of the original Uintah Valley Reservation "that were settled under the homestead and townsite laws pursuant to the 1905 Presidential Proclamation." Brief of Ute Indian Tribe at

11–13. In other words, the allocation of jurisdiction and governmental power in the Uintah Basin is defined by two inconsistent Reservation boundary overlays—one which allocates power among the named parties to this lawsuit in their dealings with each other (*Ute Indian Tribe*) and one that applies to everyone else (*Hagen*).

### (b) Collateral Estoppel vs. *Stare Decisis*

The State and Local Defendants counter the Tribe's analysis by pointing out that "almost none of the Supreme Court's reservation disestablishment cases involved the affected tribe as a party, yet those cases dispositively determined the land status of the affected lands one way or the other," (Defendants' Memorandum at 8 (footnote omitted)), and that even *Montana v. United States* recognized that collateral estoppel may not apply where there has been a change in the governing law. *Id.* at 10 (citing *Montana*, 440 U.S. at 155, 99 S.Ct. at 974). The State and Local Defendants further contend that "[t]his Court is obliged to follow the Supreme Court's decisions as binding precedent, and this requirement applies both to the Supreme Court's choice of legal standard and the result reached under that standard." *Id.* at 7 (citing *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682, 691 (3d Cir.1991), *affirmed in part, reversed in part*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and *Soto–Lopez v. New York City Civil Service Comm'n*, 755 F.2d 266, 272 (2d Cir. 1985), *affirmed*, 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986)). "The fact that the Tribe was not a party in *Hagen* ... is irrelevant to whether this Court must follow *Hagen* in deciding whether or not to grant injunctive relief.... [T]he Tribe has confused the doctrines of *stare decisis* and collateral estoppel...." *Id.*

---

court of appeals' holding in *Hagen* "that a 1985 Tenth Circuit decision had conclusively determined that Myton was in Indian country," concluding instead that "the court of appeals erred in treating Myton as Indian country" in light of *Perank*, which "establishes that for purposes of criminal jurisdiction, Myton, Utah, is not in Indian country." *Hagen*, 858 P.2d at 925–26. Unlike *Perank*, it seems fairly apparent that the

question of the collateral estoppel effect of *Ute Indian Tribe* had been raised and ruled on in *Hagen*. Notwithstanding extensive briefing of the collateral estoppel issue by *Hagen*'s successor counsel before the United States Supreme Court, the Court declined to consider the question. *See* Brief of Petitioner, 1993 WL 384821, at 12–27; Reply Brief of Petitioner, 1993 WL 409365, at 1–9.

 Of course, *stare decisis*,[55] or the rule of precedent, represents another fundamental precept of common-law adjudication:

*Stare decisis,* briefly stated, makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience to its decisions. It is derived from considerations of stability and equal treatment. Stare decisis has the broadest application of all the relitigation doctrines, in the sense that it applies not only to the parties in the particular case and those in privity with them, but also to strangers to the litigation. It deals only with law, as the facts of each successive case must be determined by the evidence adduced at trial, but to a certain extent, it is bounded by the facts that underly the judgment. As applied in a hierarchical system of courts, the duty of a subordinate court to follow the laws as announced by superior courts is theoretically absolute....

1B JAMES W. MOORE & JO DESHA LUCAS, MOORE'S FEDERAL PRACTICE ¶ 0.401, at I–2 (2d ed. rev. 1993) (footnotes omitted). *Stare decisis* is fundamentally an institutional rule, and within our judicial system, the rule of precedent primarily serves an institutional function.

[I]t is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'an arbitrary discretion.' The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)....

*Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989) (citations omitted). "*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reli-

ance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991).

 *Stare decisis* affects parties because it binds the courts before whom they appear to present their claims to follow decisions of the superior courts in the judicial heirarchy. Under this principle, "there is a general presumption that settled issues of law will not be reexamined. This presumption is fortified in the federal system by the three-tier court structure, in which the Supreme Court has a largely discretionary jurisdiction, with inferior courts that owe strict obedience to its decisions." 1B MOORE'S FEDERAL PRACTICE, *supra,* ¶ 0.402[3.—1], at I–50—I–51. Under *stare decisis,* "Courts are as a general matter in the business of applying settled principles and precedents of law to the disputes that come to bar.... Where those principles and precedents antedate the event on which the dispute turns, the court merely applies legal rules already decided, ..." *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 534, 111 S.Ct. 2439, 2442, 115 L.Ed.2d 481 (1991) (opinion of Souter, J.) (citation omitted).

 Generally, a question "'distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties,'" as the Supreme Court explained in *Montana,* already quoted above. 440 U.S. at 153, 99 S.Ct. at 973 (quoting *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Commissioner v. Sunnen,* 333 U.S. 591, 597[, 68 S.Ct. 715, 719, 92 L.Ed. 898] (1948); *Cromwell v.*

---

55. From *stare decisis et non quieta movere*—to abide by the precedents and not to disturb settled points.

The idea here expressed is congenial to all law and has been expressed in many forms throughout the whole period of the common law....

... Its most frequent and general use is synonymous with the doctrine of precedent as a whole. Its most restricted use is to indicate the "authoritative" element of the doctrine of precedent.

Leon Green, *The Development of the Doctrine of Stare Decisis and the Extent to Which It Should Be Applied,* 40 ILL.L.REV. 303, 303 n. 1 (1946) (citations omitted).

*County of Sac*, 94 U.S. 351, 352–353[, 24 L.Ed. 195] (1877)." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981).

> We have stressed that "[the] doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts...." *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917).

*Id.* at 401, 101 S.Ct. at 2429.

■ In this case, however, the State of Utah proved successful in relitigating the Uintah Reservation boundary issue and obtaining a more favorable outcome against other parties in another forum—first before the Utah Supreme Court in *Perank, Hagen* and *Coando*, and then before the United States Supreme Court in *Hagen.* That having occurred, the State and Local Defendants now dispute the initial determination of the issue in *Ute Indian Tribe* as among these parties. According to the defendants, *Hagen* sets one fundamental precept of common-law adjudication, *stare decisis*, on a collision course with another fundamental precept, the *finality* of a judgment. *Stare decisis* ensures uniform compliance with the Supreme Court's determinations of questions of federal law. Finality ensures the conclusive resolution of disputes among the parties to a lawsuit. The defendants insist that in this context, finality must give way to uniformity.

From the plaintiff Ute Indian Tribe's standpoint, perhaps the most disquieting aspect of the defendants' position is the suggestion that the scope and extent of the tribe's jurisdictional authority—and to some extent its destiny as a governmental entity—may be decisively resolved in proceedings in which the Ute Indian Tribe itself was denied the opportunity to participate as a party, even though the Tribe had already litigated that question and obtained a final judgment deciding the issue—a final judgment ostensibly binding the State and the local governments who participated in that litigation as parties.

The Tribe would insist that in this context, uniformity must give way to finality.

■ In our system of common-law adjudication, when precedent changes the law in some respect, a question may arise as to whom the new rule applies. "[A] decision may be made fully retroactive, applying both to the parties before the court and to all others by and against whom claims may be pressed, consistent with res judicata and procedural barriers such as statutes of limitations"—a practice that "is overwhelmingly the norm," (*James B. Beam Distilling Co. v. Georgia*, 501 U.S. at 535, 111 S.Ct. at 2443 (opinion of Souter, J.)), or a court may prescribe that the change have a more limited, even purely prospective effect. *See, e.g., Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (opinion of Brennan, J.). Generally, however, when the Court decides a case and applies a new legal rule to the parties before it, "it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, *to all pending cases, ...*" *Reynoldsville Casket Co. v. Hyde*, —— U.S. ——, ——, 115 S.Ct. 1745, 1748, 131 L.Ed.2d 820 (1995) (emphasis added) (citing *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)).

■ A new precedent normally does not nullify prior judgments binding parties as to claims or issues already presented, decided, and resolved—as to cases no longer pending. *Stare decisis* does not operate so as to unravel the intricate tapestry of individual judgments already made final each time a new decision is announced. There are acknowledged limits to a new precedent's retroactive effect:

> Of course, retroactivity in civil cases must be limited by the need for finality, see *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371[, 60 S.Ct. 317, 84 L.Ed. 329] (1940); once a suit is barred by res judicata ... a new rule cannot reopen the door already closed. It is true that one might deem the distinction arbitrary, ...: why should someone whose failure has otherwise become final not enjoy the next day's new rule, from which

victory would otherwise spring? ... Insofar as equality drives us, it might be argued that the new rule should be applied to those who had toiled and failed, but whose claims are now precluded by res judicata; ...

... While those whose claims have been adjudicated may seek equality, a second chance for them could only be purchased at the expense of another principle. " 'Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of that contest, and that matters once tried shall be considered forever settled as between the parties.'" *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401[, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103] (1981) (quoting *Baldwin v. Iowa State Traveling Men's Assn.*, 283 U.S. 522, 525[, 51 S.Ct. 517, 518, 75 L.Ed. 1244] (1931)). Finality must thus delimit equality in a temporal sense, and we must accept as a fact that the argument for uniformity loses force over time....

*James B. Beam Distilling Co. v. Georgia*, 501 U.S. at 541, 542, 111 S.Ct. at 2446, 2447 (opinion of Souter, J.) Citations omitted).

The State of Utah and indeed, the city and county defendants, routinely enjoy the benefit of the constraints imposed on the operation of *stare decisis* by considerations of finality—the idea that after final judgment, "a new rule cannot reopen the door already closed." *Id.* at 541, 111 S.Ct. at 2446. They rest confident in the knowledge, for example, that a myriad of prior state criminal convictions will not be reopened each time the United States Supreme Court adopts a new reading of constitutional criminal procedure. *See generally Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (new rules apply retroactively to all criminal cases pending on direct review); *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (new rule will not relate back to govern state convictions challenged on habeas corpus).

Most recently, following nearly identical principles, the Tenth Circuit concluded that *Hagen* does not apply retroactively to invalidate prior federal convictions involving offense conduct occurring within the limits of the Uintah Reservation as defined in *Ute Indian Tribe*. In *United States v. Cuch*, 79 F.3d 987 (10th Cir.1996), the court of appeals affirmed Judge Sam's denial of post-conviction collateral review[56] sought by individual Indian offenders who argued that because their crimes took place within the "opened" portion of the Uintah Reservation (*e.g.*, in Roosevelt, Utah), their convictions were void for lack of jurisdiction under *Hagen* and their sentences should therefore be vacated pursuant to 28 U.S.C. § 2255 (1994).

Judge Stephen Anderson, writing for the Tenth Circuit in *Cuch*, read *Hagen* to this effect: "the Supreme Court held that the state had jurisdiction to prosecute Hagen because Congress had diminished the Uintah Reservation in the early 1900s," and as a result, "[t]he *Hagen* decision effectively overruled the contrary conclusion reached in the *Ute Indian Tribe* case, redefined the Reservation boundaries resulting from our earlier decision, and conclusively settled the question." *Cuch*, 79 F.3d at 989. Nevertheless, the court of appeals declined to vacate the movants' sentences:

> The argument that a jurisdictional ruling such as *Hagen* should not be applied retroactively to cases on collateral review is based on principles of finality and fundamental fairness. As the Court emphasized in *Teague v. Lane*, 489 U.S. 288, 309[, 109 S.Ct. 1060, 1074, 103 L.Ed.2d 334] (1989), "the principle of finality ... is essential to the operation of our criminal justice system." Consequently,
>
> > "[t]he interest in leaving concluded litigation in a state of repose ... may quite legitimately be found by those responsible for defining the scope of the writ to outweigh in some, many, or most instances the competing interest in readjudicating convictions according to all legal standards in effect when a habeas petition is filed."

*Id.* at 306[, 109 S.Ct. at 1073] (quoting *Mackey v. United States*, 401 U.S. 667, 683, 91 S.Ct. 1171, 1175, 28 L.Ed.2d 388

---

**56.** *See United States v. Cuch*, 875 F.Supp. 767 (D.Utah 1995).

(1971) (Harlan, J., concurring in judgments in part, dissenting in part)). *Hagen* was decided after these movants' convictions became final. Its result "was not dictated by precedent existing at [that] time." *Id.* at 301, 109 S.Ct. at 1070 (emphasis omitted). Thus, its holding should not provide the basis for collateral attack in these cases. *See Gilmore v. Taylor,* 508 U.S. 333, 338, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993); ...

*Id.* at 991 (footnotes & citations omitted).[57] Clearly, the principle of finality played a decisive role in the court's reasoning in *Cuch:*

We emphasize that these are cases on collateral review. The convictions are final. Direct appeal times have passed. Furthermore, the federal courts were the only tribunals available, both pursuant to our decisions and by intergovernmental pact. The state of Utah was barred from prosecuting such crimes from 1976 to 1994 by state stipulations and orders, federal injunctions, and *conclusive federal litigation to which it was a party.* Case law

binding the state, affirmed by this court sitting *en banc,* with certiorari denied by the Supreme Court, required exclusive federal jurisdiction....

*Id.* at 992 (emphasis added).[58]

Without addressing the principle of finality or its effect on *stare decisis,* the State and Local Defendants argue that a Supreme Court decision finding diminishment of reservation boundaries (*e.g., Hagen*) may have binding effect under *stare decisis* even absent the affected tribe's participation. Indeed, of the six Supreme Court reservation boundary cases cited by the defendants, only *Rosebud Sioux Tribe v. Kneip* joined both tribal and state governments in the same litigation. Defendants' Memorandum at 8–9 & nn. 6–7.[59]

At the same time, however, none of the referenced cases *relitigated* a reservation boundary issue after it had already been decided in prior litigation directly involving the affected tribal, state, and local govern-

**57.** Quoting *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987), the court of appeals elaborated: " 'By "final," we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.' " *Cuch,* 79 F.3d at 991 n. 9.

**58.** The court of appeals also addressed the view expressed by a magistrate judge in *Cuch* "that *Hagen* did not effect a 'change' in federal law, but merely clarified what had been the law all along," that *Ute Indian Tribe* " 'made an erroneous interpretation of federal law,' " that " 'Congress had already defined the limits of federal jurisdiction' " and that " '[i]t was the inability to see the jurisdictional line drawn by Congress that created the problem.' " *Cuch,* 79 F.3d at 994.

The magistrate judge's analysis partakes of the Blackstonian common law view that courts do no more than discover the law. *Linkletter v. Walker,* 381 U.S. 618, 622–23[, 85 S.Ct. 1731, 1733–34, 14 L.Ed.2d 601] (1965). "The Blackstonian view ruled English jurisprudence and cast its shadow over our own "through much of our jurisprudential history. *Id.* at 624[, 85 S.Ct. at 1734–35]. But American law, drawing as it does from experience, gradually recognized that "such a rule was out of tune with actuality." *Id.; see also id.* at 629[, 85 S.Ct. at 1737]. In time the Supreme Court admitted that "[t]he past cannot always be erased by a new judicial declaration," *Chicot*

*County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 374[, 60 S.Ct. 317, 318, 84 L.Ed. 329] (1940). "Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination." *Id.* In short, while a judicial decision is in effect, "it is ... an existing juridical fact." *Linkletter,* 381 U.S. at 624[, 85 S.Ct. at 1734–35] (discussing Austinian view).

This latter view is now firmly established in the federal courts....

*Id.* at 994–95. *Cuch* further notes that "[w]hile later cases have overruled the specific retroactivity test announced in *Linkletter, see, e.g., Griffith v. Kentucky,* 479 U.S. 314[, 107 S.Ct. 708, 93 L.Ed.2d 649] (1987), the cases have continued to recognize the validity of *Linkletter* 's underlying premise...." *Id.* at 995 n. 16 (citations omitted).

**59.** *See Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914).

ments as parties.[60] With the exception of the Rosebud Sioux Tribe, none of the affected tribes in *Solem, DeCoteau, Mattz, Seymour,* or *Pelican* appear to have taken affirmative steps to obtain declaratory relief concerning reservation boundaries before the Supreme Court ruled. Here, the Ute Indian Tribe plainly had obtained such affirmative relief in advance of *Hagen.*

While the Tenth Circuit reads *Hagen* as "effectively overrul[ing] the contrary conclusion reached in the *Ute Indian Tribe* case, redefin[ing] the Reservation boundaries resulting from our earlier decision, and conclusively settl[ing] the question," (*Cuch,* 79 F.3d at 989), it does not afford the new precedent unlimited reach. *Cuch* explicitly holds that *Hagen* does not operate to reopen final judgments in criminal cases in the context of collateral review under 28 U.S.C. § 2255.

The case law cited by the Utah Supreme Court in footnote 3 of *Perank* as suggesting that the State of Utah was *not* collaterally estopped from relitigating the boundary issue as against *different* parties in *Perank, Hagen* and *Coando,* seems to state as firmly that the State *is* collaterally estopped from relitigating the boundary issue as against the Ute Indian Tribe. In *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), cited in *Perank,* 858 P.2d at 931 n. 3, the Supreme Court points out that "where the parties are the same, estopping the Government spares a party that has already prevailed once from having to relitigate...." 464 U.S. at 164, 104 S.Ct. at 574. In *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984), also cited in *Perank,* the Court held that mutual collateral estoppel precluded the Environmental Protection Agency from relitigating

the application of provisions of the Clean Air Act to inspections of a Stauffer plant in Tennessee where Stauffer had prevailed in litigating the same issue in a prior Tenth Circuit case involving EPA inspection of a Stauffer plant in Wyoming: "the doctrine of mutual defensive collateral estoppel is applicable against the Government to preclude relitigation of the same issue already litigated against the same party in another case involving virtually identical facts." 464 U.S. at 165, 104 S.Ct. at 575. "As commonly explained," *Stauffer Chemical* noted, "the doctrine of collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." *Id.* at 170–71, 104 S.Ct. at 578–79. The policy argument noted in *Perank, viz.,* that it may be preferable to allow relitigation by the State as to "a decision on an issue of such substantial public importance that will inevitably recur, ... even if res judicata were otherwise applicable against the State," (858 P.2d at 931 n. 3), proves to be an argument "persuasive only to prevent the application of collateral estoppel against the Government in the absence of mutuality. When estoppel is applied in a case where the Government is litigating the same issue arising under virtually identical facts against the same party, as here, the Government's argument loses its force." *Stauffer Chemical,* 464 U.S. at 173, 104 S.Ct. at 579–80.

 At least as to parties with whom the State has litigated and lost, the State is not free to "litigat[e] the same issue arising under virtually identical facts against the same party" over and over again until it obtains a more favorable result.[61] While the

---

**60.** The most analogous case in that regard, *Solem,* addressed the reservation boundary issue in the context of a federal habeas corpus proceeding, reaching a result that was inconsistent with two prior state appellate decisions, *State v. Janis,* 317 N.W.2d 133 (S.D.1982), and *Stankey v. Waddell,* 256 N.W.2d 117 (S.D.1977). 465 U.S. at 465–466 & n. 4, 104 S.Ct. at 1161–64 & n. 4. While the Cheyenne River Sioux Tribe filed *amicus curiae* briefs in all three cases, it was not joined as a party to any one of them; the state was a party in *Solem* and *Janis,* both of which arose out of state criminal prosecutions.

**61.** The same idea finds expression in, *e.g.,* the Double Jeopardy Clause of the Fifth Amendment. *See, e.g., Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957) ("The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, ...").

res judicata and collateral estoppel doctrines do not carry the compelling force of a constitutional requirement, the common wisdom that litigants are rightfully entitled to have but *one* "bite at the apple" reflects the important societal values intrinsic in the *finality* of court judgments, even in instances of litigation among competing sovereigns.[62] As the United State Supreme Court observed in *Montana v. United States* (a case involving litigation between sovereigns), the doctrines of res judicata and collateral estoppel remain "central to the purpose for which civil courts have been established, *the conclusive resolution of disputes within their jurisdictions.*" 440 U.S. at 153, 99 S.Ct. at 973 (emphasis added).

### (c) Collateral Estoppel and Reservation Boundary Litigation

Some guidance as to the role of collateral estoppel in reservation boundary litigation may be gleaned from *White Earth Band of Chippewa Indians v. Alexander*, 518 F.Supp. 527 (D.Minn.1981), *affirmed*, 683 F.2d 1129 (8th Cir.1982), *cert. denied sub nom. Counties of Mahnomen and Clearwater, Minnesota v. White Earth Band of Chippewa Indians and Alexander v. White Earth Band of Chippewa Indians*, 459 U.S. 1070, 103 S.Ct. 488, 489, 74 L.Ed.2d 631 (1982). In *White Earth Band*, the Band filed a complaint in federal district court in 1974, seeking declaratory and injunctive relief against state officials and the State of Minnesota regarding competing claims of jurisdiction over the White Earth Chippewa Reservation located within that State. Three Minnesota counties and four individuals intervened. 683 F.2d at 1132.

In *State of Minnesota v. Clark*, 282 N.W.2d 902 (Minn.1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), the Minnesota Supreme Court determined that the White Earth Chippewa Res-

ervation was not disestablished by 1889 allotment legislation which, *inter alia*, provided for cession of four of the reservation's thirty-six townships, or approximately 92,000 acres. 282 N.W.2d at 908. The *White Earth Band* litigation meanwhile had been "held in abeyance by agreement of the parties and with court approval" while the *Clark* litigation (involving criminal prosecution of White Earth Band members on the theory that the reservation had been disestablished) proceeded through the state courts. 683 F.2d at 1132–1133. Relying on *Clark*, the district court in *White Earth Band* held that the reservation was "diminished" to the extent of the four-township cession, but that the remaining thirty-two township reservation continued to exist. 518 F.Supp. at 534. The district court entered an order precluding "further litigation of the disestablishment issue as it affected the thirty-two townships and issued a permanent injunction prohibiting the state from enforcing its gaming laws against Band members within the thirty-two townships." 683 F.2d at 1133.

On appeal from the district court's preclusion order, the state, county, and individual parties asserted that a significant change in the law rendered collateral estoppel inapplicable to the disestablishment issue and further, that "the collateral estoppel bar should not be applied because the purposes of the doctrine are not met in this case." *Id.* at 1134. The Eighth Circuit rejected both arguments, declaring that "further inquiry into the status of the thirty-two township area would result in needless litigation." *Id.* at 1135 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979)).

In the present case the parties agree that the technical requirements of collateral estoppel are satisfied pursuant to the four-part analysis of *Oldham v. Pritchett*, 599 F.2d 274 (8th Cir.1979). According to

---

**62.** Absent some measure of finality, the Tribe would have accomplished essentially nothing by seeking and obtaining a final judgment granting relief under the Declaratory Judgments Act, 28 U.S.C. § 2201 (1994), in an attempt to resolve the boundary issue more than two decades ago. Such a result would plainly frustrate the purpose of the Declaratory Judgment Act, a remedy well

suited to a controversy such as this. *See* CHARLES A. WRIGHT, LAW OF FEDERAL COURTS § 100, at 713–14 (5th ed. 1994) (the Act "creates a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, ...").

the *Oldham* court, collateral estoppel is appropriate where:

> (1) the issue ... [is] ... identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privy with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Id.* at 279.

. . . .

> ... Assuming arguendo that the disestablishment issue is a question of law, the "legal change" exception to collateral estoppel is not available here because the court in *Clark* had *DeCoteau, Rosebud,* and *United States v. Minnesota[,* 466 F.Supp. 1382 (D.C.Minn.1979) ] before it when it found that the Nelson Act had not disestablished the thirty-two townships. The *Clark* court applied the correct standard to resolve the disestablishment issue. . . .
>
> . . . .
>
> ... [R]eopening litigation of this particular disestablishment issue would not minimize the possibility of differing adjudications on disestablishment issues. The Nelson Act treated various bands or tribes and reservations differently, ... and contemplated that a separate agreement would be negotiated with individual bands or tribes pursuant to the Act. ... When a court has determined disestablishment of a given reservation in its particular historical and factual setting, prevention of inconsistent adjudication becomes desirable insofar as it fosters reliance on judicial decision making.

683 F.2d at 1134, 1135 (citations omitted). The Eighth Circuit concluded that the district court "did not abuse its discretion in finding that the counties had a full and fair opportunity to litigate their claims in *Clark* and are collaterally estopped from relitigat-

ing the question of disestablishment." *Id.* at 1135.

■■■■■ As *White Earth Band* demonstrates, collateral estoppel may operate to preclude relitigation of an Indian reservation boundary issue by state and local governments where a court has already determined the issue "in its particular historical and factual setting" and where those entities "had a full and fair opportunity to litigate their claims." The policies underpinning collateral estoppel—" 'protecting litigants from the burden of relitigating an identical issue with the same party ... and ... preventing needless litigation' " (*id.* at 1133 (quoting *Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. at 649)—are no less meaningful in the context of reservation diminishment cases than in other kinds of litigation, particularly where the affected governmental entities have been participating as parties.[63]

### (d) Collateral Estoppel and "Controlling Legal Principles"

The State and Local Defendants assert in this case that the doctrine of collateral estoppel "has no application where there has been an intervening change in legal principles." Defendants' Memorandum at 10. Yet cases such as *Stauffer Chemical* appear to draw a distinction between the announcement of general rules of law—"controlling legal principles"—and more particularized findings applying legal rules to specific facts. In *Montana v. United States,* the Court rejected the Government's position that "controlling legal principles" had changed, excepting that litigation from the collateral estoppel effect of a prior Montana Supreme Court ruling; in fact, the Government's own pleadings in that case "suggest[ed] the absence of any major doctrinal shifts since the Montana Supreme Court's decision." 440 U.S. at 161–162, 99 S.Ct. at 977–978.

---

**63.** Parties would be ill-advised to read *Hagen* as an open invitation to relitigate issues already determined in litigation in which they have participated, where the disposition of the issues has been incorporated into a final judgment of this court, the United States Court of Appeals for the Tenth Circuit, or any other court of competent jurisdiction. Where a party has come into court seeking judicial resolution of a dispute, merely characterizing an issue as one of "substantial public importance" gives no party *carte blanche* to disregard the court's judgment altogether and attempt to relitigate the same issue either in another lawsuit or another forum.

Because the factual and legal context in which the issues of this case arise has not materially altered since [Peter Kiewit Sons' Co. v. State Bd. of Equalization] *Kiewit I*, [161 Mont. 140, 505 P.2d 102 (1973),] normal rules of preclusion should operate to relieve the parties of "redundant litigation [over] the identical question of the statute's application to the taxpayer's status." *Tait v. Western Maryland R. Co.*, 289 U.S. 620, 624[, 53 S.Ct. 706, 707, 77 L.Ed. 1405] (1933)....

*Id.* at 162, 99 S.Ct. at 978 (citation omitted). The Court also rejected the assertion that collateral estoppel did not apply in *Montana* because the Government had raised " 'unmixed questions of law' in successive actions involving substantially unrelated claims." *Id.* Quoting *United States v. Moser*, 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924), the Court further stated, " '[A] *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law.' " *Id.* (emphasis added by the Court).

*Stauffer Chemical* also discussed the "unmixed question of law" exception, admitting "uncertainty as to its application." 464 U.S. at 171, 104 S.Ct. at 578. However, "for the purpose of determining when to apply an estoppel," the Court agreed that

"[w]hen the claims in two separate actions between the same parties are the same or are closely related ... it is not ordinarily necessary to characterize an issue as one of fact or of law for purposes of issue preclusion.... In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of 'law'." Restatement (Second) of Judgments § 28, Comment *b* (1982).

*Id.* (footnote omitted).

In the context of this litigation, *Hagen* does not purport to alter or depart from the "fairly clean analytical structure" established by "[o]ur precedents in the area"—the three-factor approach articulated in *Solem v. Bartlett*, 465 U.S. 463, 469–71, 104 S.Ct. 1161, 1165–67, 79 L.Ed.2d 443 (1984). *Hagen*, 510 U.S. at 408–09, 114 S.Ct. at 964. *Hagen* works no deliberate change in "controlling legal principles," if understood to refer to general rules of law. Any "change" wrought by *Hagen* must be found in the *application* of the *Solem* analysis to the "particular historical and factual setting" of the Uintah Reservation—"what is essentially the same controversy, even if the issue is regarded as one of 'law'," as was decided among these parties more than ten years ago in *Ute Indian Tribe.*

Be that as it may, this court need not determine *Ute Indian Tribe*'s "validity for collateral estoppel purposes" (Defendants' Memorandum at 24) in this proceeding. Here, the question of *Ute Indian Tribe*'s finality or conclusiveness does not arise in a collateral proceeding, to be decided according to the doctrine of collateral estoppel. It arises from a much more immediate and fundamental source.

### The "Mandate Rule"

"Law of the case" rules have developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURES § 4478, at 788 (1981).

Of these rules, the most compelling is the mandate rule. This fundamental rule binds every court to honor rulings in the case by superior courts. As the Supreme Court has stated, "In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948). The statutory authority for the power of the appellate courts dates from the first Judiciary Act of 1789 and is now found in 28 U.S.C. § 2106.

*Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848, 856 (3d Cir.

1994) (footnotes omitted).[64] "The so-called 'mandate rule' is simply a subspecies of the venerable 'law of the case' doctrine, a staple of our common law as old as the Republic...." *Federated Rural Electric Insurance Corp. v. Arkansas Electric Cooperatives, Inc.*, 896 F.Supp. 912, 914 (E.D.Ark. 1995) (citation omitted).

> Whatever was before the [superior] Court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; nor give any other or further relief; nor review it upon any matter decided on appeal, for error apparent; nor intermeddle with it, further than to settle so much as has been remanded.

*Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838). Indeed, "the rule has remained essentially unchanged in nearly one hundred and fifty years":

> It is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal.
>
> A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.

*Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d at 857 (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir.1985) (citations omitted)). "The rule ensures 'careful observation of [the] allocation of authority' established by the three-tier system of federal courts which 'is necessary for a properly functioning judiciary.'" *Id.* (quoting *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1508 (11th Cir.1987)).

▇ In this Circuit, "The rule is well established that a district court must comply strictly with the mandate rendered by the reviewing court. *See Laffey v. Northwest Airlines, Inc.*, 642 F.2d 578, 584–85 (D.C.Cir. 1980) (district court has 'no power to reconsider issues laid to rest' on prior appeal)." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1534 (10th Cir.), *cert. denied*, 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 337 (1992). *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992) ("Among the law of the case rules is the obligation of every court to honor the rulings of a court that stands higher in the hierarchical judicial structure. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4478 at 788.").

The "law of the case" doctrine requires every court to follow the decisions of courts that are higher in the judicial hierarchy. *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir.1991), *cert. denied*, [504] U.S. [910], 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir.1990); see generally 18 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4478 (1993). The doctrine applies to issues previously decided, *Quern v. Jordan*, 440 U.S. 332, 347, n. 18, 99 S.Ct. 1139, 1148, n. 18, 59 L.Ed.2d 358 (1979), either explicitly or by necessary implication. *Heathcoat*, 905 F.2d at 370; *Cherokee Nation v. Oklahoma*, 461 F.2d 674, 678 (10th Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972).

*Guidry v. Sheet Metal Workers Intern. Ass'n, Local No. 9*, 10 F.3d 700, 705–706 (10th Cir.1993). *See generally Anthony v. Baker*, 955 F.2d 1395, 1397 n. 1 (10th Cir. 1992) (law of the case doctrine encompasses both explicit and implicit decisions of reviewing court).

▇ In addressing the scope and effect of the "mandate rule," one must be careful to distinguish the principle from the terminolo-

---

**64.** 28 U.S.C. § 2106 (1994) provides:

The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

gy used to identify it. "Law of the case terminology is often employed to express the principle that inferior tribunals are bound to honor the mandate of superior courts within a single judicial system...." 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478, at 792, 793 (1981) (footnote omitted).[65] Yet the "law of the case" established by a higher court's mandate does not operate according to the same principles as the "law of the case" reflected in a court's own rulings.

> It is often stated that the decision of an appellate court on an issue of law becomes the law of the case on remand. *This application of the doctrine lacks completely the flexibility of the same doctrine as applied to the law decided by the trial court prior to judgment.* In this situation the district court owes obedience to the mandate of the Supreme Court or the court of appeals and must carry it into effect according to its terms. It can be compelled to do so by mandamus, or by a second appeal.

1B JAMES W. MOORE & JO DESHA LUCAS, MOORE'S FEDERAL PRACTICE ¶ 0.404[10], at II–58—II–60 (2d ed. rev. 1993) (emphasis added & footnotes omitted). That a district court may alter or abandon its own prior ruling, or "law of the case," does not mean that a district court may alter or ignore an appellate court mandate—even where the reasons for doing so are equally compelling— simply because the mandate is also termed the "law of the case." The principles and policies involved differ, regardless of the sameness of their labeling.

In the context of an appellate court mandate,

> There is some uncertainty whether a lower court must seek permission from an appellate court before departing from the man-

date on the ground that intervening changes in the law require re-examination of issues actually decided, but this is more a problem of sound relationships within the judicial hierarchy than a problem of stability within a single proceeding.

18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478, at 793–94 (1981) (footnote omitted). The commentary cites to *Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 248–49 & n. 8 (2d Cir.1979), which in turn cites to *Higgins v. California Prune and Apricot Grower, Inc.*, 3 F.2d 896, 897 (2d Cir.1924), and *Rankin v. Atlantic Maritime Co.*, 117 F.Supp. 253 (S.D.N.Y.1953).

In *Higgins,* the Second Circuit observed that "feeling bound by the mandate of this court" on remand following a prior appeal, the district court had declined—"rightly, as we think"—to consider effect of *Kline v. Burke Constr. Co.,* 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922), a subsequent Supreme Court decision seeming to lead to a result contrary to the mandate. Judge Learned Hand, writing for the Second Circuit in *Higgins,* continued: "If, however, we are free to reconsider our earlier decision at all, there would seem to be no question of our duty to follow the later decision of the Supreme Court. We think we are so free, ..." 3 F.2d at 897.

> [I]t is now well settled that the "law of the case" does not rigidly bind a court to its former decisions, but is only addressed to its good sense.... There can be surely be no greater reason for changing our views than because the Supreme Court has directly ruled upon the precise point in the interim.

*Id.* at 898 (citations omitted).[66]

 *Higgins* highlights the critical difference in posture between the court of appeals

---

**65.** This litigation belies the remark by Professors Wright, Miller and Cooper that "[t]his principle is so straight-forward as to present few interesting problems." *Id.* at 793.

**66.** *Accord, Zdanok v. Glidden Co.,* 327 F.2d 944, 951 (2d Cir.) cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964) ("[I]f, before a case in a district court has proceeded to final judg-

ment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error, no principles of 'the law of the case' would warrant a failure on our part to correct the ruling"), *aff'd,* 370 U.S. 530 (1962); *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981) (considering Supreme Court decision intervening between first and second appeals), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

and the district court in dealing with the effect on a mandate of a later Supreme Court decision: what may be deemed *reconsideration* of an earlier ruling—"changing our views"—at the court of appeals level may well be deemed *noncompliance* if undertaken at the district court level.[67] The difference is one of power.

In *Rankin v. Atlantic Maritime Co.,* the question of the effect of a subsequent Supreme Court decision upon a prior court of appeals mandate was raised before the district court, but only *after* a party had sought and obtained leave *at the court of appeals level* for the district court to consider the effect of that more recent Supreme Court ruling:

> While awaiting trial [following remand] the Supreme Court on May 25, 1953 decided *Lauritzen v. Larsen,* [345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254], whereupon defendant sought and obtained an order in the Court of Appeals granting leave to this court to entertain "a certain motion in this cause". Defendant now moves to dismiss....
>
> ....
>
> Plaintiff urges that the doctrine of *res judicata* precludes decision of the instant motion. The 'law of the case' obstacle, which would otherwise have precluded a decision of this motion, was removed by the order of the Court of Appeals granting permission to this court to entertain it. I take such order to mean that the Court of Appeals intended that the motion be decided on the merits with the guidance of the Larsen decision. Otherwise, the appellate court's entertainment of that motion would have been a futile gesture.

117 F.Supp. at 254 (footnote omitted).

█ The "law of the case" as reflected in a court's own rulings involves a question of practice, not one of power. "A court that makes a decision has the *power* to reconsider it, so long as the case is within its jurisdiction." 1B Moore's Federal Practice ¶ 0.404[1], at II–2 (emphasis in original). *See, e.g., Mason v. Texaco, Inc.,* 948 F.2d

1546, 1553 (10th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). The "law of the case" as reflected in a court of appeals' mandate necessarily represents an exercise of supervisory power of the appellate tribunal over the lower court. "[A]fter the law of the case is determined by a superior court, the inferior court lacks authority to depart from it, and any change must be made by the superior court that established it, or by a court to which it, in turn, owes obedience." 1B Moore's Federal Practice ¶ 0.404[1], at II–2—II–3.

## Exceptions to the Mandate Rule?

The command given by the mandate rule seems clear: follow the mandate. Nevertheless, some courts relying on "law of the case" terminology "have recognized a few exceptions which might allow a matter to be revisited."

> They are (1) the availability of new evidence, (2) an intervening change of controlling law, or (3) the need to correct a clear error or prevent manifest injustice. *E.g., In re Progressive Farmers Ass'n,* 829 F.2d 651, 655 (8th Cir.1987) (on remand lower court required to follow appellate court decision unless new evidence introduced or decision is clearly erroneous and works manifest injustice); cited in *Bethea v. Levi Strauss,* 916 F.2d 453, 457 (8th Cir.1990).

*Federated Rural Electric Insurance Corp. v. Arkansas Electric Cooperatives, Inc.,* 896 F.Supp. at 914. *See also United States v. Bell,* 988 F.2d 247, 251 & n. 2 (1st Cir.1993) (as a branch of the law of the case doctrine, the mandate rule "is a discretion-guiding rule subject to an occasional exception in the interests of justice"); *Thomas v. Bible,* 983 F.2d 152, 155 (9th Cir.1993) ("None of the recognized grounds justifying departure from a court of appeals' mandate under the preclusive doctrine of "law of the case," (*e.g.,* newly discovered evidence, an intervening change in governing law) are present here."); *Cameo Convalescent Center, Inc. v. Percy,* 800 F.2d 108, 110 (7th Cir.1986) (where court of ap-

---

**67.** And "[d]isobedient district judges ... are not infrequently corrected for failure to honor the mandate rule as the law of the case on remand."

18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478, at 792–93 (footnote omitted).

peals' decision issued one day before Supreme Court decision that changed the law, "the district court properly applied the new law to the claim before it."); *Piambino v. Bailey,* 757 F.2d 1112, 1119–20 (11th Cir. 1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). In *Leggett v. Badger,* 798 F.2d 1387 (11th Cir.1986), the Eleventh Circuit expressed the view that the mandate rule,

> usually referred to as the "law of the case" doctrine, has three exceptions that allow a federal district court to act contrary to the appellate decision: (1) when new and substantially different evidence is presented subsequent to the appeal; (2) when controlling authority has been rendered, contrary to the law of the appellate decision; (3) when the prior decision was clearly erroneous and would work a manifest injustice if implemented. *Stanley v. United States,* 786 F.2d 1490, 1498 (11th Cir.1986).

798 F.2d at 1389 (footnote omitted). *Leggett* affirmed that "the district court ... correctly declined to enforce our mandate" in light of a subsequent Supreme Court decision to the contrary. *Id.* at 1390. Even so, the *Leggett* panel "note[d] the need to read and apply these exceptions narrowly. A district court should follow the law of the case as decided by the appellate court unless the court is certain that one of the three specifically and unquestionably applies." *Id.* at 1389 n. 2.[68]

The Eleventh Circuit has also approved a district court's departure from its mandate in light of an intervening change in controlling state law. *Ad–Vantage Telephone Directory Consultants v. GTE Directories Corp.,* 943 F.2d 1511, 1520 (11th Cir.1991). While expressing a willingness to follow intervening state court decisions in the context of a remand for trial (*e.g., Menne v. Celotex Corp.,* 861 F.2d 1453, 1475 n. 38 (10th Cir.1988)), the Tenth Circuit specifically rejected a similar suggestion by the defendant in *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 962 F.2d 1528, 1534 (10th Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 414, 121

L.Ed.2d 337 (1992), in the context of a remand for entry of judgment based upon the court of appeals' disposition of the legal issues.

In a prior appeal in the *Colorado Interstate Gas* case, (885 F.2d 683 (10th Cir.1989) ("CIG II")), the Tenth Circuit had issued a mandate instructing the district court "to enter judgment in accordance with the opinion of this court" affirming an $8 million tort award in CIG's applying Wyoming law. Subsequently, the Wyoming Supreme Court decided *Price v. Sorrell,* 784 P.2d 614 (Wyo. 1989), in which it declined to adopt the legal theory relied upon by the Tenth Circuit in affirming CIG's tort claim. The defendant urged that "until such time as a case is no longer *sub judice,* the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court," (*Vandenbark v. Owens–Illinois Glass Co.,* 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941)), and argued that *Price v. Sorrell,* now a "controlling decision of the highest state court," required dismissal of CIG's tort claim. The Tenth Circuit held to the contrary:

> A suit is deemed " 'pending until the appeal is disposed of,' and until disposition any judgment appealed from it is still *sub judice.*" *de Rodulfa v. United States,* 461 F.2d 1240, 1253 (D.C.Cir.) (quoting *Mackenzie v. A. Engelhard & Sons Co.,* 266 U.S. 131, 142–43, 45 S.Ct. 68, 69 L.Ed. 205 (1924)), *cert. denied,* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972); *Nicastro v. United States,* 206 F.2d 89, 92 (10th Cir. 1953). Following appellate disposition, however, the judgment is no longer subject to district court amendment beyond the ministerial dictates of the mandate, which encompasses the full scope of jurisdictional power granted to the district court on remand.
>
> ... [W]e conclude that the question of which state law properly applied was no

---

68. The Seventh Circuit has emphasized the narrowness of one such exception in more colorful terms: "To be clearly erroneous, a decision must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. To be clearly erroneous, then, the ... decision must be dead wrong, and we do not believe it is." *Parts & Electric Motors, Inc. v. Sterling Electric, Inc.,* 866 F.2d 228, 233 (7th Cir.1988), *cert. denied,* 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989).

longer *sub judice* after this court disposed of the appeal in *CIG II* and the time for a petition for certiorari had passed.

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 962 F.2d at 1534. Moreover, *Colorado Interstate Gas* eschewed the use of a motion for relief from judgment under Fed.R.Civ.P. 60(b) as a means of raising the subsequent state court decision:

> Over thirty years ago, this court held in *Collins* that "[a] change in the law or in the judicial view of an established rule of law is not such an extraordinary circumstance which justifies relief" under Rule 60(b). *Id.* at 839.... The *Collins* holding is still the rule in this circuit. *See Van Skiver v. United States,* 952 F.2d 1241, 1244–45 (10th Cir.1991).

*Id.* at 1535 (quoting *Collins v. City of Wichita,* 254 F.2d 837, 839 (10th Cir.1958)).[69] "Thus," the Tenth Circuit concluded, "Natural had no basis on which it could have asked the district court to apply the *Price* case: *this case was already over* for purposes of selecting the governing law." *Id.* (emphasis added). At that point, the district court was duty bound to conform to the Tenth Circuit's judgment.

### The Tenth Circuit Mandate in *Ute Indian Tribe* Remains in Force

The Tenth Circuit's mandate in *Ute Indian Tribe,* received and docketed by this court on December 9, 1986,[70] directs that "the cause is remanded to the United States

District Court for the District of Utah for further proceedings in accordance with the opinion of this Court," referring to the Tenth Circuit's *en banc* ruling. Since that ruling decided the boundary question on the merits, leaving no remaining issues to be addressed by this court, *Ute Indian Tribe* was no longer *sub judice* [71] after December 9, 1986. The "further proceedings" contemplated by the mandate amount simply to the enforcement of the court of appeals' judgment. *See Gabaldon v. Westland Development Co., Inc.,* 485 F.2d 263, 266 (10th Cir.1973) ("The mandate was for further proceedings not inconsistent with the views of the Supreme Court. Such 'further proceedings' were, of course, to implement at the local level the ruling of the higher court.")

This court has identified no reported Tenth Circuit case permitting a district court within the Tenth Circuit to ignore the court of appeals' mandate because in the district court's mind, its judgment is inconsistent with subsequent Supreme Court precedent.[72] The court has found one reported suggestion that a district court may depart from a Tenth Circuit mandate in light of new and different evidence, but that suggestion was made in the context of a retrial after remand, while the matter still remained *sub judice:*

> In *Delano v. Kitch,* 663 F.2d 990 (10th Cir.1981), we held that in conducting a retrial, the trial court should follow rulings of law previously made by the court of appeals. That mandate was faithfully fol-

---

**69.** The Tenth Circuit declined to extend an intervening decision of its own in *Pierce v. Cook & Co.,* 518 F.2d 720, 722–23 (10th Cir.1975), which the *Colorado Interstate Gas* panel read as "finding extraordinary circumstances [under Rule 60(b)] where the change in law arose out of the same accident in which plaintiffs had been involved." *Id.*

**70.** Under Fed.R.App.P. 41(a), "A certified copy of the judgment and a copy of the opinion of the court, if any, and any direction as to costs shall constitute the mandate, unless the court directs that a formal mandate issue." In this instance, this court received a copy of the court of appeals' judgment, dated September 17, 1985 accompanied by a copy of the opinions reflecting the *en banc* decision, also reported at 773 F.2d 1087. Reference in this Memorandum Opinion and Or-

der to the Tenth Circuit's "mandate" embraces both of these documents.

**71.** "We note that *sub judice* 'means "under judicial consideration" or in court and not yet decided.' Black's Law Dictionary 1277 (5th ed. 1979). We thus hold that the Supreme Court's denial of certiorari ended this litigation, and the case was not *sub judice* when the defendants made their rule 60(b)(6) motion." *Seese v. Volkswagenwerk, A.G.,* 679 F.2d 336, 337 (3d Cir.1982) (district court denial of Rule 60(b) relief based upon subsequent Fourth Circuit decision affirmed).

**72.** Likewise, the Tenth Circuit has cited to *Leggett*'s treatment of law of the case, but only once, and then it was in the context of the court of appeals' review of its own prior determinations; the district court in that case was expected simply to comply with the mandate. *United States v. Monsisvais,* 946 F.2d 114, 116 (10th Cir.1991).

lowed by the trial court in this case. Under the "law of the case" doctrine, the district court may not deviate from the appellate court's mandate; however, the district court may reconsider an issue and disregard the appellate court mandate *if the subsequent trial produces substantially different evidence.* Lindsey v. American Cast Iron Pipe Co., 810 F.2d 1094 (11th Cir.1987).

*Mason v. Texaco, Inc.,* 948 F.2d 1546, 1553 (10th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992) (emphasis added). Similarly, *Delano v. Kitch,* cited in *Mason,* indicates that the law of the case must yield to a controlling state court decision—when that decision is issued between the first ruling and a retrial. 663 F.2d at 996. *Cf. McGhee v. Draper,* 639 F.2d 639, 646 (10th Cir.1981). Where the court of appeals has decided an issue, however, its mandate may preclude the consideration of additional evidence on that issue after remand. *See, e.g., Fox v. Mazda Corp. of America,* 868 F.2d 1190, 1194 (10th Cir.1989) (affirming district court's exclusion of proffered expert testimony and damages model on ground it was precluded by the terms of the mandate). Even in the cases from other circuits discussed above, the purported "exceptions" to the mandate rule generally come into play only after remand for purposes of a new trial or other substantive activity. *E.g., Leggett v. Badger,* 798 F.2d 1387, 1389 (remanded for determination of award of attorney's fees). Where the merits of the controversy have been conclusively determined on appeal, "the judgment is no longer subject to district court amendment beyond the ministerial dictates of the mandate." *Colorado Interstate Gas,* 962 F.2d at 1534. "A different result would allow the district court to substitute its opinion for that of this court, which is what the law of the case doctrine is intended to avoid." *United States v. Monsisvais,* 946 F.2d 114, 118 (10th Cir.1991).

The court of appeals expects district courts to comply with its mandates even where the Supreme Court has indicated that a party may be entitled to relief beyond that afford-ed by the mandate. In *Citizen Band of Potawatomi Indian Tribe of Oklahoma v. Oklahoma Tax Comm'n,* 969 F.2d 943 (10th Cir.1992), the Tenth Circuit affirmed the district court's denial of injunctive relief requiring the tribe to collect state cigarette taxes consistent with its obligations under *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).

> Nothing in the District Court's order on remand precludes the Tax Commission from pursuing the remedies that the Supreme Court has indicated are available to it.
>
> The district court precisely followed our remand order which instructed it to dismiss the Tax Commission's counterclaim and enter an injunction prohibiting the Tax Commission from enforcing the challenged assessment for previously uncollected taxes against the Tribe.... In going no further, the district court recognized its lack of discretion when confronted with a specific mandate by this court. *See Rutherford v. United States,* 806 F.2d 1455, 1460 (10th Cir.1986) ("district court is ... bound by the appellate court mandate")....

969 F.2d at 947–48.

This court does not sit in review of judgments of the court of appeals. As tempting as that prospect may sometimes be, Congress has espoused the opposite approach since creating the circuit courts of appeal in 1891,[73] and forming the Tenth Circuit in 1929,[74] a court renamed the United States Court of Appeals for the Tenth Circuit in 1948. *See* CHARLES A. WRIGHT, LAW OF FEDERAL COURTS § 3, at 10 (5th ed. 1994). Given the institutional structure as it exists, with its corresponding allocation of power (*see* 28 U.S.C. § 2106), this court must abide by the court of appeals' mandates unless and until it receives different instructions from the court of appeals. While "[l]aw of the case principles do 'not bar a district court from acting unless an appellate decision has issued on the merits of the claim sought to be preclud-

---

**73.** *See* Evarts Act, Act of March 3, 1891, ch. 517, 26 Stat. 826.

**74.** *See* Act of February 28, 1929, ch. 363, 45 Stat. 1346.

ed," [75] here the Tenth Circuit plainly determined the diminishment issue by applying the *Solem* analysis to the Uintah Reservation in its particular historical and factual setting. *Hagen* applied the *Solem* analysis to the same setting, reaching a different result. Both decisions were rendered on the merits.

This court may not substitute its own view for that of the appellate court in either instance.

**Recall of the Mandate**

Mechanisms do exist for revisiting a court of appeals' mandate where a second look seems warranted. As explained by one well-known treatise:

> If circumstances arise that cast doubt on the correctness of the law of the case as established on appeal, arguments in support of departure must be addressed to the appellate court, either in a petition for rehearing, or if the time for filing a motion for rehearing has passed, by motion for recall of the mandate, or on appeal from the judgment rendered after completion of the proceedings for which the case was remanded.

1B JAMES W. MOORE & JO DESHA LUCAS, MOORE'S FEDERAL PRACTICE ¶ 0.404[10], at II–60—II–61 (2d ed. rev. 1993) (footnotes omitted).[76] The Tenth Circuit acknowledges that a party may "seek . . . to have this court recall its mandate for any correction it thought was necessary to the district court's judgment." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1533 n. 3 (10th Cir.), *cert. denied*, 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 337 (1992).

The Navajo Nation sought reconsideration of the reservation disestablishment issue in *Yazzie* using precisely this same procedural device: "In conjunction with the instant appeal, the Navajo Nation filed a motion pursuant to Fed.R.App.P. 27 asking this court to partially recall its earlier mandate in *Pittsburg & Midway I.*"

The Tribe asks us not to apply the doctrine of law of the case so that the reservation diminishment issue decided there may be reexamined. The law of the case is a judicial doctrine designed to promote decisional finality. Once a court decides an issue, the doctrine comes into play to prevent the re-litigation of that issue in subsequent proceedings in the same case. *Arizona v. California*, 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *United States v. Monsisvais*, 946 F.2d 114, 115–16 (10th Cir.1991). The Navajo Nation is correct that unlike the doctrines of res judicata or collateral estoppel, "the law of the case doctrine has long been considered only a rule of practice in the courts and not a limit on their power." *Id.* at 116.

> Nevertheless, the circumstances justifying a departure from the law of the case are narrow. The most widely quoted statement is by former Tenth Circuit Chief Judge Orie Phillips, sitting in another circuit, that the law of the case must be followed "unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice."

*Id.* at 117 (quoting *White v. Murtha*, 377 F.2d 428, 432 (5th Cir.1967); *see also Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981)). We are persuaded that none of these three circumstances exist in the instant case, and therefore deny the Tribe's motion.

---

75. *Wilmer v. Board of County Commissioners of Leavenworth County*, 69 F.3d 406, 409 (10th Cir. 1995) (quoting *United States v. Caterino*, 29 F.3d 1390, 1395 (9th Cir.1994)).

76. *Moore's Federal Practice* further suggests that "[e]ven after judgment is entered on the mandate, however, the district court has the power to consider a motion under Rule 60(b) for relief from judgment, without first obtaining the permission of the court of appeals." 1B MOORE'S FEDERAL PRACTICE ¶ 0.404[10], at II–61 (footnote omitted) (citing *LSLJ Partnership v. Frito–Lay, Inc.*, 920 F.2d 476 (7th Cir.1990)). However, the Tenth Circuit appears to discourage that approach, at least in cases where the merits have been determined on appeal and are no longer *sub judice. See* discussion *infra*.

*Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1536 n. 4 (10th Cir.1995).

The Tenth Circuit's current reading of *Hagen*, articulated in *United States v. Cuch*, 79 F.3d 987 (10th Cir.1996), that "[t]he *Hagen* decision effectively overruled the contrary conclusion reached in the *Ute Indian Tribe* case, redefined the Reservation boundaries resulting from our earlier decision, and conclusively settled the question," (*Cuch* at 989), may well establish "circumstances justifying a departure from the law of the case." *Watchman*, 52 F.3d at 1536 n. 4.[77] While the Tenth Circuit has said that it may depart from its own "law of the case" on a motion to recall that court's mandate, nothing in *Watchman* even hints that the district court may disregard or defy the appellate court's existing judgment in any respect, absent such a departure by the court of appeals.

**Resolution of the Questions Now Presented**

■ A motion to recall the mandate may be filed even after the time to pursue other appellate procedures has expired. *See United States v. Winterhalder*, 724 F.2d 109 (10th Cir.1983). To date, however, it appears that no party has asked the United States Court of Appeals for the Tenth Circuit to recall its mandate in *Ute Indian Tribe* for reconsideration in light of *Hagen*.

Nor for that matter have the parties made any visible strides in the direction of an agreed long-term resolution of the jurisdictional issues remaining after both *Ute Indian Tribe* and *Hagen*.

■ Were these parties the only constituents of the necessary jurisdictional mix, this court might well be inclined simply to proceed with specific enforcement of the *Ute Indian Tribe* mandate notwithstanding the State and Local Defendants' *Hagen*-based objections. However, the Tenth Circuit's *en banc* ruling in *Ute Indian Tribe* does not reach one party indispensable to a practical allocation of jurisdiction within "Indian country": the United States.

If the United States abides by the Supreme Court's decision in *Hagen*—as one normally would expect the United States to do—it must decline to exercise jurisdiction over offenses involving Indians committed within the lands "opened" in 1905. At the same time, *Ute Indian Tribe* would constrain the State and local authorities from exercising jurisdiction over such offenses involving Ute tribal members occurring within that same area. While the Tribe may exert its own jurisdiction pursuant to *Ute Indian Tribe*, Congress has limited the powers of Indian tribes to punish serious offenses. *See* 25 U.S.C.A. § 1302(7) (Supp.1995) (tribes shall not impose punishment "greater than imprisonment for a term of one year and a fine of $5,000, or both"); *cf. United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Moreover, if enforcing the *Ute Indian Tribe* mandate notwithstanding *Hagen* means that in matters affecting tribal members, the State and Local Defendants must treat the Reservation as "Indian country" to the full extent of its original boundaries, this may leave *no* sovereign available to punish *non-Indians* who may commit serious offenses involving Indians or Indian lands within the original boundaries of the Uintah Reservation. *See* 18 U.S.C. § 1152 (1994).[78] As the court of appeals

77. The Tenth Circuit has acknowledged that where the Supreme Court has made it clear that a new ruling should be applied retroactively, and it would be futile to require the district court to follow its prior order and apply a standard that has been discarded by the Supreme Court, recall of the mandate is appropriate. "Although we rarely exercise such authority, this court does have the inherent power to recall the mandate after it has issued. *Abel v. West*, 932 F.2d 898, 899 (10th Cir.1991); *Hammons v. Int'l Playtex, Inc.*, 872 F.2d 963, 963 (10th Cir.1989)." *Gomez v. State of New Mexico*, 937 F.2d 616 (Table), 1991 WL 132445 (10th Cir., July 15, 1991) (No. 89–2004) (unpublished disposition).

78. Generally, "[c]riminal offenses by non-Indians against Indians or their property are subject to the Indian Country Crimes Act [18 U.S.C. § 1152 (1994)]. The Supreme Court has said that federal court jurisdiction under this Act is exclusive of state court jurisdiction." FELIX S. COHEN, FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW 353 (Rennard Strickland ed. 1982) (footnotes omitted). Even if one could say that the State and Local Defendants are not estopped under *Ute Indian Tribe* to prosecute a non-Indian offender in that instance, jurisdiction even to investigate the offense would remain in doubt until the status of a suspect is determined. Coupled with the reduced state and local law enforcement presence

might say, this is "an untenable prospect," and nothing this court may do in crafting a permanent injunction can fill that gap.[79]

For this reason, this court has determined forthwith to raise the question of the continuing force of *Ute Indian Tribe* in light of *Hagen v. Utah* with the court of appeals. While this court *sua sponte* can neither return the Tenth Circuit's mandate nor compel its recall, it seems wholly appropriate under these circumstances to request further instructions from the court of appeals concerning the proper conduct of "further proceedings in accordance with the opinion of this Court" as set forth in the mandate received on December 9, 1986.

**A Request for Further Instructions**

Such a request is not entirely without precedent. Section 1254(2) of the Judicial Code provides that cases in the court of appeals may be reviewed "[b]y certification at any time by a court of appeals of any question of law in any civil or criminal cases as to which instructions are desired," and upon such certification, "the Supreme Court may give binding instructions or require the entire record to be sent up for decision of the entire matter in controversy." 28 U.S.C. § 1254(2) (1994). This provision originated in the Act of April 29, 1802, ch. 31, § 6, 2 Stat. 156, 159, and has been adapted over the years as the courts of appeals themselves have evolved. *See* 17 CHARLES A. WRIGHT, ARTHUR R. MIL-LER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4038 (2d ed. 1988). The certification mechanism contemplates that a court "may find great difficulty in resolving a question of law, and may believe the question is of such general importance that it should be resolved by the Supreme Court." *Id.* § 4038, at 105. A "somewhat comparable provision for interlocutory review in the courts of appeals," (*id.* § 4038, at 105 & n. 14), is found in 28 U.S.C. § 1292(b).[80]

The analysis of the mandate rule convinces this court that "a lower court must seek permission from an appellate court before departing from the mandate on the ground that intervening changes in the law require re-examination of issues actually decided," (18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 793 (1981)), and this court's request for further instructions is expressly made with that understanding.

*Standard Oil Co. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) (per curiam), does not hold to the contrary. *Standard Oil* held that a district court has jurisdiction to entertain a motion under Fed. R.Civ.P. 60(b) to reopen a case following review on appeal without prior leave of the appellate court or the withdrawal of the appellate mandate. In that case, the movant sought to set aside a judgment granting injunctive relief, alleging misconduct on the

---

in "Indian country" that one might expect under *Ute Indian Tribe*, prosecution under state jurisdiction of a non-Indian committing offenses against tribal members would prove problematic at best.

In this respect, the Supreme Court itself has undertaken to limit Indian tribal sovereignty more severely than any congressional legislation. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (Indian tribes lack criminal jurisdiction over non-Indians as a consequence of their "dependent status"); *United States v. Wheeler*, 435 U.S. 313, 322–323, 98 S.Ct. 1079, 1085–86, 55 L.Ed.2d 303 (1978); *Duro v. Reina*, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) (Indian tribal courts lack criminal jurisdiction over Indians who are not tribal members), *legislatively overruled by* Pub.L. No. 102–137, § 1, 105 Stat. 646 (1991), codified at 25 U.S.C.A. § 1301(2), (4) (Supp.1995). *See Mousseaux v. U.S. Comm'r of Indian Affairs*, 806 F.Supp. 1433, 1439–1443 (D.S.D.1992).

**79.** This kind of practical anomaly seems markedly different from saying that collateral estoppel simply requires that the Government inspect Stauffer Chemical plants in one fashion while inspecting other manufacturers' plants in another fashion. *See United States v. Stauffer Chemical Co.*, 464 U.S. at 174, 104 S.Ct. at 580.

**80.** 28 U.S.C. § 1292(b) reads:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal may thereupon, in its discretion, permit an appeal to be taken from such order, . . .

part of opposing counsel and a witness. Because "the appellate mandate relates to the record and issues then before the court" and "does not purport to deal with possible later events," the Court concluded that a district court would not be "flouting the mandate by acting on the motion." 429 U.S. at 18, 97 S.Ct. at 31 (citing 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2873, pp. 269–170 (1973)). The Tenth Circuit has read *Standard Oil* to this effect:

> Under the law the district court retains the power to act on a Rule 60(b) motion after this Court has resolved a matter upon appeal, and there is no necessity that a petition requesting permission to exercise such authority be filed with this Court. *Standard Oil Co. of California v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976); *Wilkin v. Sunbeam Corporation,* 405 F.2d 165 (10th Cir.1968).

*Prop–Jets, Inc. v. Chandler,* 575 F.2d 1322, 1325 (10th Cir.1978).[81]

Even after *Standard Oil,* "[o]f course the district judge is not free to flout the decision of the appellate court as far as it goes, ..." 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2873, at 439 (2d ed. 1995) (footnote omitted). Although *Standard Oil* confirms a district court's jurisdiction under Rule 60(b) to consider "a material change of circumstances or newly discovered evidence" not considered on appeal—including instances in which the "change of circumstances" is purely legal—the courts of appeal generally have declined to treat a post-appeal "change in decisional law" as grounds for Rule 60(b)(6) relief from a judgment in a matter no longer *sub judice,* even "in federal cases where the Supreme Court has changed the applicable rule of law." *DeWeerth v. Baldinger,* 38 F.3d 1266, 1273 (2d Cir.1994) (Walker, J.) (citing *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 851 (5th Cir. 1990)). This view appears to be consistent with the Tenth Circuit's opinion in *Colorado Interstate Gas* discussed above:

> As a corollary to this [mandate] rule, we are convinced that Rule 60(b)(6) cannot be properly used to alter the substantive content of a judgment once it has been affirmed on appeal except in extraordinary situations. To hold otherwise would be to permit a district court to violate our mandate that a judgment be entered "in accordance with the opinion of this court."

962 F.2d at 1534.[82]

The State and Local Defendants have not framed, briefed, or argued their pending motion as a Rule 60(b) motion. Even if they had, however, cases such as *Colorado Interstate Gas* suggest that any "change in decisional law" reflected in *Hagen* cannot suffice as grounds for Rule 60(b) relief because the *Ute Indian Tribe* case was no longer *sub judice*—it "was already over" regarding the merits of the diminishment issue.[83]

---

**81.** *Accord, Petrick v. Walters,* 81 F.3d 173 (Table), 1996 WL 131686 (10th Cir., Mar 25, 1996) (No. 95–6356) (unpublished disposition) ("See *Standard Oil Co. of California v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) (district court may entertain Rule 60(b) motion to reopen an judgment that has been reviewed on appeal without obtaining leave of the appellate court....).").

**82.** *Accord, Sack v. Wagoner County, Oklahoma,* 996 F.2d 311 (Table), 1993 WL 220593 (10th Cir.1993) (No. 92–7085, 92–7091) (unpublished disposition):

> The district court may entertain a rule 60(b) motion to reopen a decision that has been affirmed on appeal without obtaining leave from the appellate court. *Standard Oil Co. v. United States,* 429 U.S. 17, 18–19[, 97 S.Ct. 31, 31–32, 50 L.Ed.2d 21] (1976). The district court, however, must "comply strictly with the mandate rendered by the reviewing court." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.,* 962 F.2d 1528, 1534 (10th Cir.), cert. denied, [506 U.S. 956,] 113 S.Ct. 414[, 121 L.Ed.2d 337] (1992).
>
> ....
>
> ... In this circuit, ... [Rule 60(b)(6) ] cannot be used 'to alter the substantive content of a judgment once it has been affirmed on appeal except in extraordinary situations.' *Colorado Interstate Gas,* 962 F.2d at 1534....

*Id.* 1993 WL 220593, at *2.

**83.** *Standard Oil* thus may be read to say that a district court may consider the question under Rule 60(b), but *Colorado Interstate Gas* instructs that the answer to the question, at least under Rule 60(b)(6), shall in these circumstances be "no."

Simply put, a Rule 60(b) motion made in this setting would appear futile.

These circumstances present "a problem of sound relationships within the judicial hierarchy," (18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 at 793–794), and raise a question concerning enforcement of the court of appeals' judgment with respect to these parties that evades simple resolution. As a question of public law and the allocation of power among governments, it appears to be of such "general importance" that it should be resolved by the United States Court of Appeals for the Tenth Circuit. In light of the identified area of conflict between the court of appeals' judgment in *Ute Indian Tribe* and the Supreme Court's decision in the *Hagen* case, and the practical consequences which flow from that conflict, further instructions from the court of appeals would clearly be helpful, and would certainly be welcomed.

■ The court of appeals may also recall its mandate on its own motion, and sometimes it has done so. *See, e.g., Pepcol Mfg. Co. v. Commissioner of Internal Revenue,* 28 F.3d 1013 (10th Cir.1993); *Hammons v. International Playtex, Inc.,* 872 F.2d 963 (10th Cir.1989). *Cf. McCarthy v. Maddigan,* 962 F.2d 973 (10th Cir.1992) (recall of mandate following reversal by Supreme Court). Citing 28 U.S.C. §§ 2106 and 452,[84] the Tenth Circuit articulated the pertinent standard in *Coleman v. Turpen,* 827 F.2d 667 (10th Cir. 1987):

> While a mandate once issued by our court will not be recalled except for good cause shown, an appellate court has power to set aside at any time a mandate that was procured by fraud *or act to prevent an injustice,* or to preserve the integrity of the judicial process. *Greater Boston Television Corp. v. F.C.C.,* 463 F.2d 268 (D.C.Cir.1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). And see discussion, *American Iron and Steel Institute v. E.P.A.,* 560 F.2d 589 (3rd Cir. 1977); *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978).

*Id.* at 671 (emphasis in original) (citing *Clarke v. Boysen,* 273 F. 923 (8th Cir.1921)). The court of appeals may construe this court's request for instructions as an invitation to recall its own mandate, should it so choose. In any event, the motions pending before this court raise a question only the court of appeals is genuinely in a position to answer.

### The "Dependent Indian Communities" Question—18 U.S.C. § 1151(b)

Justice Stewart overlooked one practical consequence of that court's finding of reservation diminishment in *Perank:* the question of the applicability of 18 U.S.C. § 1151(b), which provides that "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state" are within "Indian country" within the meaning of the statute. A finding that Myton, Utah comprises a "dependent Indian community" would once again locate the town within "Indian country," with all of the jurisdictional consequences that flow from that status. *Hagen*'s conclusion that "the town of Myton ... is not Indian country" likewise appears to be unexamined concerning the applicability of § 1151(b), and consequently may have been somewhat premature.

In the *Yazzie* case, cited by both *Hagen* and *Perank,* the Tenth Circuit held that the boundaries of the 1907–08 Addition to the Navajo Reservation were disestablished through restoration of unallotted lands to the public domain, but remanded the case "for consideration of whether some or all of P & M's South McKinley Mine is within Indian country under 18 U.S.C. §§ 1151(b) or (c)...." 909 F.2d at 1422. Though touched upon in the *Yazzie* opinion and addressed in detail in its companion case, *Blatchford v. Sullivan,* 904 F.2d 542, 544–549 (10th Cir. 1990), this logical next step in the analysis was apparently overlooked by both the *Hagen* and *Perank* courts. *See also United States v. State of South Dakota,* 665 F.2d 837 (8th Cir.1981) (Indian housing project located

---

84. 28 U.S.C. § 452 provides in part that the "expiration of a session of court in no way affects the power of the court to do any act or take any proceeding."

within former Lake Traverse Reservation (*DeCoteau*) is "dependent Indian community" within § 1151(b)).

The Tenth Circuit did not address the applicability of 18 U.S.C. § 1151(b) in *Ute Indian Tribe* because the status of the communities involved as "Indian country" was subsumed in its determination that the Uintah Valley Reservation had not been diminished. Once a different conclusion is reached on the § 1151(a) reservation boundary issue, questions immediately arise as to the application of the balance of the statute—§ 1151(b), which addresses "dependent Indian communities," and possibly § 1151(c), which deems "all Indian allotments, the Indian titles to which have not been extinguished" to be within "Indian country."

While the State and Local Defendants do not dispute that Indian allotments within the original boundaries of the Uintah Valley Reservation remain "Indian country" under § 1151(c) even after *Hagen,* a determination that Myton, Randlett, Duchesne, or other towns are "dependent Indian communities" under § 1151(b) would extend federal and tribal jurisdiction to non-trust, or fee lands located within those towns.

The parties to this proceeding have acknowledged the § 1151(b) question to be a factual issue not yet ripe for determination by this court on the present record. *See, e.g.,* Transcript of Hearing, dated September 12, 1994, at 55:6–18 (Mr. Andrews). This issue must therefore await the court of appeals' disposition of this court's more immediate request. Should the § 1151(b) issue become ripe for determination thereafter, the matter will likely be set down for an evidentiary hearing consistent with the analysis detailed in, *e.g., Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1542–1546 (10th Cir.1995).

If nothing else, consideration of the implications of § 1151(b) will serve to remind everyone that Indian tribes are comprised of communities having "contemporary demographics" of their own, and that the Indians, too, are "people living in the area." [85] *See,*

*e.g.,* Veronica E. Velarde Tiller, ed., Tiller's Guide to Indian Country 573–574 (1996).

**Other Issues: Uncompahgre, the Forest Withdrawals, etc.**

As noted above, this court need not and does not reach any question concerning the present status of the Uncompahgre Reservation, or of those lands withdrawn from the Uintah Reservation for national forest purposes; the status of both areas was determined on the merits in *Ute Indian Tribe* and neither matter was raised as an issue before the Supreme Court in the *Hagen* case. *State of Utah v. Perank* expressly did not consider the "Indian country" status of either area, (858 P.2d at 934), and counsel has identified no existing conflict between *Ute Indian Tribe* and any other reported decision affecting these areas. [86] Those questions await another day.

Pending disposition of this court's request for further instructions from the court of appeals, this court also defers any dispositive ruling on the Tribe's renewed motion for permanent injunctive relief as well as the State and Local Defendants' motion to dissolve the existing Orders allocating jurisdiction among these parties pursuant to their earlier Stipulation and to dismiss the Tribe's renewed motion for injunctive relief, (*see* Pretrial Order at 15 ¶¶ 5.D) except to the extent that the Order set forth herein further clarifies the existing Order as previously modified. *See* page 1531, *infra.*

The court also chooses to defer the disposition of several other fact-sensitive issues enumerated in the Pretrial Order, such as the status of unpatented tracts within or the subsurface estate underlying, *e.g.,* Myton, Utah, in favor of consideration at a later time. *See* Pretrial Order at 14 ¶¶ 4.B, 4.C, 15 ¶ 5.E.

**Summary**

According to the United States Supreme Court's decision in *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), the 1902–1905 Acts "opening" the Uintah

---

**85.** *Hagen,* 510 U.S. at 421, 114 S.Ct. at 970.

**86.** Therefore, the answer to the first issue framed

in Paragraph 5.F of the Pretrial Order is "no."

Reservation to non-Indian entry and settlement operated to restore the unallotted and unreserved lands of that Reservation to the public domain. In doing so, the 1902–1905 Acts *diminished*—that is, reduced or curtailed—the boundaries of the Reservation to the extent of the lands thus "opened." Insofar as these "opened" lands were not later returned to tribal ownership and jurisdiction by subsequent congressional and administrative action, they ceased to have reservation status in 1905 and are no longer found within "Indian country" within the meaning of 18 U.S.C. § 1151 (1994). To that extent, *Hagen* stands in direct conflict with the Tenth Circuit's *en banc* judgment in *Ute Indian Tribe,* 773 F.2d 1087 (10th Cir.1985), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986), which held that all lands within the original exterior boundary of the Uintah Reservation remain within "Indian country" under the statute.

Nonetheless, according to both *Hagen* and *State of Utah v. Perank,*[87] the Uintah Reservation, though diminished, continued to exist after 1905 as to the lands allotted to the Indians and the lands reserved for tribal use. Though diminished, the Reservation continued to have discrete, identifiable boundaries, or "limits" within the meaning of 18 U.S.C. § 1151(a) (1994). Though diminished, "there was no question but that the land within the diminished reservation retained its status as Indian country."[88]

The Uintah Reservation boundaries were subsequently enlarged to include areas returned or added through congressional and administrative action. Those reservation lands not "opened" in 1905, together with those areas since restored or added by congressional and administrative action, comprise the current Uintah Reservation. Nontrust, or fee lands representing former Indian trust allotments, lands distributed to Mixed–Blood Utes under the Ute Partition Act, or lands exchanged out of trust status by the Tribe located within the boundaries of the Uintah Reservation remain within "Indian country" within the meaning of 18 U.S.C. § 1151(a) (1994), consistent with both *Hagen* and *Ute Indian Tribe.* The State and Local Defendants' assertion that "when lands leave trust status, they no longer fit within any category of 18 U.S.C. § 1151, and so are no longer Indian country," contradicts the express language of 18 U.S.C. § 1151(a) and finds no support in the pertinent case law; under recent Supreme Court decisions, Indian tribal trust lands are embraced "within the limits" of an Indian reservation for purposes of § 1151(a), and therefore remain within Indian country "notwithstanding the issuance of any patent," *i.e.,* any change in title or ownership.

Sound, well-settled considerations of finality presently bind these parties to the Tenth Circuit's judgment in *Ute Indian Tribe* defining jurisdiction over the "opened" lands. In an opinion for the Court announced four days before this court's initial ruling in this case in 1981, Justice Rehnquist wrote: "This Court has long recognized that '[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.'"[89] The rule of finality "'is a rule of fundamental and substantial justice, "of public policy and private peace," which should be cordially regarded and enforced by the courts....'"[90]

The mandate of the United States Court of Appeals for the Tenth Circuit in *Ute Indian Tribe v. State of Utah,* received by this court on December 9, 1986, remanded this case to this court "for further proceedings in accordance with the opinion of this Court," referring to the court of appeals' *en banc* ruling reported at 773 F.2d 1087. That mandate

---

**87.** 858 P.2d 927, 934 (Utah 1992).

**88.** *Chickasaw Nation v. State ex rel. Oklahoma Tax Comm'n,* 31 F.3d 964, 976 n. 8 (10th Cir. 1994), *affirmed in part, reversed in part on other grounds and remanded,* —— U.S. ——, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995).

**89.** *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981) (quoting *Baldwin v. Traveling Men's Assn.,* 283 U.S. 522, 525, 51 S.Ct. 517, 517–18, 75 L.Ed. 1244 (1931)).

**90.** *Id.* (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507–08, 61 L.Ed. 1148 (1917)).

remains in full force and effect. As the merits of *Ute Indian Tribe* are no longer *sub judice,* "it is well established that a district court must comply strictly with the mandate rendered by the reviewing court," (*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America,* 962 F.2d 1528, 1534 (10th Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 337 (1992)), and recognizing that even "a new rule cannot reopen the door already closed," [91] this court has no jurisdiction to reconsider the merits of the court of appeals' judgment in light of *Hagen v. Utah,* absent specific direction from the court of appeals that it may do so.

Pursuant to the court of appeals' mandate, conducting "further proceedings in accordance with the opinion" in *Ute Indian Tribe* requires continuing enforcement of the orders previously entered by this court preserving the jurisdictional status quo consistent with that ruling.

This court further concludes that the continued enforcement of *Ute Indian Tribe,* to the extent that ruling conflicts with the contrary determination in *Hagen v. Utah,* raises a question of public law and the allocation of power among federal, tribal, state and local governments which evades simple resolution, one that is a "controlling question of law" having "general importance." For that reason, this court shall request further instructions from the United States Court of Appeals for the Tenth Circuit concerning how best to proceed in accordance with that court's existing mandate in light of *Hagen v. Utah.*

This court does not reach any question concerning the determination in *Ute Indian Tribe* of the present status of the Uncompahgre Reservation, or of those lands withdrawn from the Uintah Reservation for national forest purposes as there exists no direct conflict between *Ute Indian Tribe* and *Hagan, Perank,* or any other reported case concerning those lands. The question of whether Myton, Utah, or other communities in that area constitute "dependent Indian communities" under 18 U.S.C. § 1151(b) (1994), was not addressed in either *Ute Indian Tribe* or *Hagen v. Utah,* and is not ripe for determination on the present record. For that reason, consideration of that question as well as others shall be deferred to a later date.

**Afterword**

We live in interesting times.

"As a result of the patina history has placed on the allotment Acts, the Court is presented with questions that their architects could not have foreseen." *Hagen,* 510 U.S. at 426, 114 S.Ct. at 973 (Blackmun, J., dissenting).[92] From the perspective of 1996, questions of diminishment of Indian reservation boundaries necessarily involve some amount of juristic crystal gazing. Those who drafted the Uintah Reservation opening legislation in 1902, 1903, 1904 and 1905 doubtless had no idea whatsoever that the language they chose would be central to the problem of defining federal, state, local, and tribal authority and relationships almost a century later, or that differing readings of those words would precipitate a bitter controversy dividing state and federal courts, a controversy not yet fully resolved in 1996. Yet here we are.

Of course, this matter would largely be resolved had the State of Utah simply chosen to litigate the boundary issue *once,* as its voluntary intervention and joinder at the outset of this action twenty years ago may then have implied. Instead, the State chose to press its Ute boundary diminishment theory in the state criminal cases, and upon prevailing in *Perank* and by extension, in *Hagen* and *Coando,* the State had achieved a circumstance in which the boundary issue was primed for review by the United States Supreme Court.

Likewise, this matter would now be far simpler had the United States Supreme Court afforded the Ute Indian Tribe the opportunity to participate in the *Hagen* ap-

---

**91.** *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 541, 111 S.Ct. 2439, 2446, 115 L.Ed.2d 481 (1991) (opinion of Souter, J.)

**92.** *Accord, Ute Indian Tribe,* 521 F.Supp. at 1153 (courts in reservation boundary cases are "called upon to determine the present meaning of statutes under circumstances not imagined by their draftsmen.")

peal as a party. Had the Court done so,[93] the Ute Indian Tribe would undoubtedly have been bound by whatever decision on the merits the Court ultimately made, and the present dilemma would not have arisen. *See also Perank,* 858 P.2d at 953–958 (Zimmerman, J., dissenting).

But life is seldom simple.

All of the parties to this proceeding, together with the court, must somehow arrive at a resolution of the pending jurisdictional questions that proves both rational and workable over the long term. For the Tribe, this means adjusting its jurisdictional aspirations to account for the practical effects of the Supreme Court's decision in *Hagen v. Utah,* whatever the immediate disposition of this proceeding may be. For their part, the State and Local Defendants must now cope with the benefits—and the burdens—of the "more favorable result" obtained in the *Hagen* appeal.[94] The defendants would do well to recognize that "[t]he past cannot always be erased by a new judicial declaration,"[95] and that even after *Hagen,* "people living in the area" of the Uintah Reservation includes *both* Indian and non-Indian residents, whose interests, concerns, and expectations deserve thoughtful consideration and most of all, respect.

The happiest peace is that which parties working together can find for themselves.

In light of the foregoing, therefore,

**IT IS ORDERED** that this court's previous Order, dated September 2, 1992 (*nunc pro tunc* to August 3, 1992), as modified "to allow the State and Local Defendants to prosecute felony crimes occurring on lands within the original boundaries of the Uintah Valley Reservation which are not 'Indian Country' as defined by 18 U.S.C. § 1151, *et seq.*" by this court's Order, dated May 2, 1994, is hereby further modified to clarify that for the purposes of the Order, "lands ... which are not 'Indian Country' " includes those unallotted and unreserved lands of the Uintah Reservation that were opened to entry in 1905, to the extent that those lands were not later restored to tribal ownership or otherwise reincorporated within the Reservation by subsequent congressional and administrative action, consistent with *Hagen v. Utah,* 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994); as thus clarified, the Order shall remain in full force and effect pending the disposition of this court's Certification and Request for Instructions from the United States Court of Appeals for the Tenth Circuit, or such further proceedings as may be conducted before that court addressing the questions raised herein, in any event until further order of this court.

**IT IS FURTHER ORDERED** that the Clerk of this court forthwith shall transmit the accompanying Certificate and Request for Further Instructions, together with three copies of the Certificate and three copies of this Memorandum Opinion and Order, to the Clerk of the United States Court of Appeals for the Tenth Circuit.

## CERTIFICATE AND REQUEST FOR FURTHER INSTRUCTIONS

TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT:

The above-captioned proceeding last came before the United States Court of Appeals for the Tenth Circuit on rehearing *en banc* and was decided on September 17, 1985. *Ute Indian Tribe v. State of Utah,* 773 F.2d 1087 (10th Cir.1985). Following that ruling, the United States Supreme Court denied certiorari. *State of Utah v. Ute Indian Tribe,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The court of appeals issued its Judgment pursuant to the *en banc* ruling, dated September 17, 1985, which together with the *en banc* opinion was received as the court of appeals' mandate pursuant to Fed.R.App.P.

---

**93.** Motions to intervene for the first time before the Supreme Court are unusual, but not unheard of. *See, e.g., United States Parole Commission v. Geraghty,* 445 U.S. 388, 390, 100 S.Ct. 1202, 1205, 63 L.Ed.2d 479 (1980); *Karcher v. May,* 483 U.S. 1017, 107 S.Ct. 3258, 97 L.Ed.2d 758 (1987) (mem.) (motion for leave to intervene denied).

**94.** "Be careful what you wish for—you might get it." Oscar Wilde (1854–1900).

**95.** *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 374, 60 S.Ct. 317, 318, 84 L.Ed. 329 (1940).

41(a) and docketed by the Clerk of this court on December 9, 1986.

In its *en banc* ruling, the court of appeals held that the Uintah Valley Reservation, created by Executive Order in 1861 [1] and confirmed by Act of Congress in 1864,[2] had not been diminished by congressional legislation enacted from 1902 through 1905 opening unallotted and unreserved lands on the Reservation to entry under the homestead and townsite laws,[3] or by the inclusion of portions of the Reservation among lands withdrawn as national forest lands by Act of Congress and Presidential Proclamation in 1905.[4] 773 F.2d at 1088–1090; *see also id.* at 1099–1100 (Seymour, Holloway, McKay & Logan, JJ., concurring).

According to the United States Supreme Court's decision in *Hagen v. Utah*, 510 U.S. 399, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994), the 1902–1905 Acts "opening" the Uintah Reservation to non-Indian entry and settlement operated to restore the unallotted and unreserved lands of that Reservation to the public domain. In doing so, the 1902–1905 Acts *diminished*—that is, reduced or curtailed—the boundaries of the Reservation to the extent of the lands thus "opened." Insofar as these "opened" lands were not later returned to tribal ownership and jurisdiction by subsequent congressional and administrative action, they ceased to have reservation status in 1905 and are no longer found within "Indian country" within the meaning of 18 U.S.C. § 1151 (1994). To that extent, *Hagen* stands in direct conflict with the court of appeals' *en banc* judgment in *Ute Indian Tribe*, 773 F.2d 1087 (10th Cir.1985), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986), which held that all lands within the original exterior boundary of the Uintah Reservation remain within "Indian country" under the statute.

In *United States v. Cuch*, 79 F.3d 987 (10th Cir.1996), the court of appeals described the effect of *Hagen* in these terms: "[t]he *Hagen* decision effectively overruled the contrary conclusion reached in the *Ute Indian Tribe* case, redefined the Reservation boundaries resulting from our earlier decision, and conclusively settled the question." *Cuch*, at 989. Nevertheless, consistent with principles of finality, the court of appeals held that *Hagen* is not available as a ground for collateral review of federal criminal convictions which became final prior to the *Hagen* decision.

The court of appeals' final Judgment in the above-captioned proceeding remains in place, having never been recalled or otherwise withdrawn. Motions are now pending before this Court concerning the appropriateness of injunctive relief designed to enforce the terms of the court of appeals' Judgment, notwithstanding the Supreme Court's determination in *Hagen*. (A copy of this court's Memorandum Opinion and Order addressing the issues raised by those motions and the grounds for this Certificate and Request for Further Instruction is provided herewith.)

These circumstances present a problem of sound relationships within the judicial hierarchy, and raise a question concerning enforcement of the court of appeals' Judgment with respect to these parties that evades simple resolution. As a controlling question of public law and the allocation of power among governments, it appears to be of such "general importance" that it should be resolved by the United States Court of Appeals for the Tenth Circuit. This court's analysis of the "mandate rule" component of the doctrine of "law of the case," set forth in detail in this court's accompanying Memorandum Opinion and Order, convinces this court that

---

1. Executive Order 38–1 (reprinted in 1 Charles Kappler, *Indian Affairs: Laws and Treaties* 900 (1904)).

2. Act of May 5, 1864, ch. 77, 13 Stat. 63.

3. *See* Act of May 27, 1902, ch. 888, 32 Stat. 263; J.Res. 31, 57th Cong., 1st Sess., 32 Stat. 744 (1902); Act of March 3, 1903, ch. 994, 32 Stat. 998; Act of April 21, 1904, ch. 1402, 33 Stat. 207; Act of March 3, 1905, ch. 1479, 33 Stat.

1069. (The complete text of this legislation is reprinted in Appendix A to this court's initial memorandum opinion. *See Ute Indian Tribe v. State of Utah*, 521 F.Supp. 1072, 1167–1174 (D.Utah 1981).)

4. *See* Act of March 3, 1905, ch. 1479, 33 Stat. 1069; Proclamation of July 14, 1905, 34 Stat. 3116 (reprinted in 3 Charles Kappler, *Indian Affairs: Laws and Treaties* 602–605 (1913)).

"a lower court must seek permission from an appellate court before departing from the mandate on the ground that intervening changes in the law require re-examination of issues actually decided," (18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 793 (1981), and this court's request for further instructions is expressly made with that understanding. Cf. *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1533–1535 & n. 3 (10th Cir.) ("The rule is well established that a district court must comply strictly with the mandate rendered by the reviewing court."), *cert. denied*, 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 337 (1992).

**Therefore,**

In light of the identified area of conflict between the court of appeals' Judgment in *Ute Indian Tribe* and the Supreme Court's decision in the *Hagen* case, and the practical consequences which flow from that conflict, this court hereby requests further instructions from the court of appeals concerning the proper conduct of "further proceedings in accordance with the opinion of this Court" as set forth in the Judgment dated September 17, 1985 and received by this court on December 9, 1986.

Further instructions on this question would clearly be helpful, and would certainly be welcomed. If it so chooses, the court of appeals may construe this court's request for instructions as an invitation to recall its own mandate for further consideration. *See Coleman v. Turpen*, 827 F.2d 667, 671 (10th Cir.1987); *cf. Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1536 n. 4 (10th Cir.1995) (Indian tribe "filed a motion pursuant to Fed.R.App.P. 27 asking [the court of appeals] to partially recall its earlier mandate" concerning reservation diminishment issue).